**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JAMES PRICE**, | |
| Plaintiff, | |
| v. | Case No. 18-cv-1339 (CRC) |
| **UNITED STATES DEPARTMENT OF JUSTICE**, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

This case began as a Freedom of Information Act ("FOIA") dispute, in which Plaintiff, federal inmate James Price, advanced familiar FOIA claims challenging the adequacy of the Department of Justice's ("DOJ") search for records and the legitimacy of its withholdings. But DOJ's allegedly suspicious responses to Price's and other inmates' FOIA requests prompted Price to amend his complaint, adding claims that the Attorney General and the Archivist of the United States have been violating their statutory duties under the Federal Records Act ("FRA") by permitting the creation and storage of records in a manner that makes retrieving them difficult if not impossible. Because Price believes this illicit record-keeping system might cause the permanent loss of records relating to his and others' criminal cases, he seeks a temporary restraining order and preliminary injunction requiring the Attorney General and Archivist to put an end to it and to recover any missing records. For the reasons set forth below, the Court will deny Price's motion.

## I.    Background

In June 2012, Mr. Price was convicted by a jury of knowing distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1), and knowing possession of

child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2).  See Minute

Entry, United States v. Price, No. 12-cr-600016-KMW, ECF No. 92 (S.D. Fla. June 29, 2012).

In 2013, he was sentenced to a prison term of 156 months, followed by 25 years of supervised

release.  See Judgment, United States v. Price, No. 12-cr-600016-KMW, ECF No. 122 (S.D. Fla.

Apr. 11, 2013).  Price appealed his conviction to the Eleventh Circuit, arguing among other

things that the evidence was insufficient to prove the knowledge element for both convictions.

United States v. Price, 582 F. App'x 846, 846 (11th Cir. 2014).  A three-judge panel

unanimously rejected Price's arguments and affirmed his convictions.  Id. at 853.

    Price, however, grew convinced that something was amiss in the government's

investigation and prosecution of him and of suspected child pornographers generally.  Beginning

in May 2017, he filed a series of FOIA requests relating to the Internet Crimes Against Children

Task Force ("ICAC-TF").  Am. Compl., ECF No. 47, ¶¶ 7–12.  His first request, for example,

asked for "any and all reports, documentation, and data by the [ICAC-TF] for" a particular case

number.  See ECF No. 13, Ex. A.[1]  His second request, meanwhile, sought "[a] complete copy of

the [ICAC-TF] Operations Manual, including all abstracts, annexes, and appendices" and an

"index of all cases and evidence processed by [the High Technology Investigations Unit]."  Id.,

Ex. F.  There were many more where those came from.  Over nearly two years, Price claims to

have filed "in excess of 100 FOIA requests to agencies across the Executive Branch to probe the

agencies' technological operating methods and related financial structures."  Pl's Mot. for

Temporary Restraining Order ("TRO Mot."), ECF No. 52, ¶ 2.  In addition to the requests Price

---

[1] This document is titled "Amended Complaint" on the docket but is not the operative complaint for purposes of this motion.  To avoid confusion, the Court does not provide the document title in its citation to this docket entry.

filed personally, he "organized a coordinated effort involving multiple parties to make recursive requests to 'cross-check' the records produced by the Defendants, and the variety of records the Defendants could not locate or produce." Id. ¶ 7.  In total, Price "filed and directed the filing, of more than 250 requests for records, documents, information, and data to more than a dozen federal, state, and local agencies—including the Defendants" in this case.  Id. ¶ 8.

In light of what Price believed were untimely, incomplete, and inconsistent responses to his and other's FOIA requests, Price filed suit in the District Court for the Southern District of Florida on November 29, 2017.  See Complaint, ECF No. 1.  That court transferred the case to this district in May 2018.  See Order granting Plaintiff's Motion to Transfer, ECF No. 26.

But before the Court took any action on Price's FOIA claims, he apparently had learned enough from the DOJ's FOIA responses to detect what he insists is additional (and connected) illegal behavior.  He contends that "[t]he Defendants' responses and statements demonstrated a calculated pattern of not mere deception but actual deceit," TRO Mot. ¶ 3, namely a "stratagem to create federal records 'off-book' with the specific intent to thwart" federal records law "and to mislead the courts as to the true availability of the records" in the government's custody, id. ¶ 6.[2] So Price moved to amend his complaint to add claims under the Administrative Procedure Act ("APA") and Federal Records Act ("FRA"), and add as defendants the Attorney General and Archivist.  See Plaintiff's Motion for Leave to Amend Complaint, ECF No. 38.  After the

---

[2] Price is part of a growing chorus raising concerns about the technology used in child pornography investigations.  See Human Rights Watch, *Letter to US Department of Justice About Child Protection System Software* (Feb. 1, 2019), https://www.hrw.org/news/2019/04/03/letter-us-department-justice-about-child-protection-system-software#; Jack Gillum, *Prosecutors Dropping Porn Charges After Software Tools Are Questioned* (Apr. 3, 2019), https://www.propublica.org/article/prosecutors-dropping-child-porn-charges-after-software-tools-are-questioned.

government failed to oppose Price's motion, the Court granted Price leave to amend and accepted for filing his amended complaint.  See Minute Order of December 14, 2018; Am. Compl., ECF No. 47.

In January 2019, Price filed a motion for a temporary restraining order and preliminary injunction, which concerns only the FRA (via APA) claims raised in the amended complaint. See TRO Mot.  Those claims can be found in Counts 1, 2, and 4.  Count 1 alleges that then-Attorney General Jeff Sessions (now William Barr) "violated his duty under 44 U.S.C. § 3106" by failing to "notify the Archivist concerning the unlawful removal of the records, and by failing to initiate legal action through [the Office of the Attorney General] to recover the records."  Am. Compl. ¶ 45.  As a remedy for that alleged violation, Price seeks a "declaratory judgment that" the Attorney General "is in violation of his non-discretionary, statutory duties under the Federal Records Act," and an injunction requiring him "to recover unlawfully alienated, destroyed or removed records[.]"  Id. ¶ 50.  Count 2 alleges substantially the same against Archivist David Ferriero and seeks an order requiring Ferriero to initiate legal action to recover the allegedly lost records.  See id. ¶¶ 52–57.  Count 4 alleges that DOJ violated "the Acts," including the FRA, "by and through the authorization, implementation, and on-going use of a private recordkeeping system," id. ¶ 78, which was "a deliberate means to effect a policy and practice of the alienation, removal, and or destruction of federal records," id. ¶ 80.  For that violation, Price requests a preliminary injunction requiring DOJ to "cease all unlawful recordkeeping[.]"  Id. ¶ 83.

In essence, Price's motion asks the Court to enjoin DOJ from using its current recordkeeping system and to require the Attorney General and Archivist to take legal action to recover records Price fears have been removed from DOJ's custody.  The government has opposed Price's motion, which is now ripe for the Court's resolution.

## II.   Legal Standard

"The court considers the same factors in ruling on a motion for a temporary restraining order and a motion for a preliminary injunction."  Morgan Stanley DW Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001); see also Vencor Nursing Ctrs., L.P. v. Shalala, 63 F. Supp. 2d 1, 7 n. 5 (D.D.C. 1999).  A temporary restraining order or preliminary injunction is warranted only when the movant demonstrates "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction is not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (citation omitted).  The party seeking injunctive relief "must make a clear showing that [the] four factors, taken together, warrant relief."  League of Women Voters of United States v. Newby, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks omitted).

## III.   Analysis

Price's fundamental contention is that DOJ has created and stored records in a manner that either makes the records impossible to retrieve or, if they can be retrieved at all, makes their recovery too time consuming and unreliable.  He maintains that this violates the FRA, which imposes upon both the Attorney General and Archivist a mandatory duty to take corrective action.  According to Price, because both must act but neither has, this Court should compel them to do so.  The Court begins with an overview of the FRA and the ability of private litigants, like Price, to bring claims under it.

### A.   Private Causes of Action for FRA Violations

The FRA requires heads of federal agencies to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions,

procedures, and essential transactions of the agency."  44 U.S.C. § 3101.  It also requires each

agency head to "establish safeguards against the removal or loss of records the head of such

agency determines to be necessary and required by regulations of the Archivist," the head of the

National Archives and Records Administration ("NARA").  Id. § 3105.

"When those safeguards fail, the Act sets forth a structure whereby the Archivist and

agency heads are to work together to ensure that no documents are unlawfully destroyed."

Judicial Watch, Inc. v. Tillerson, 293 F. Supp. 3d 33, 37 (D.D.C. 2017), aff'd sub nom. Judicial

Watch, Inc. v. Pompeo, 744 F. App'x 3, 3 (D.C. Cir. 2018).  First, an agency head

> shall notify the Archivist of any actual, impending, or threatened unlawful
> removal, defacing, alteration, corruption, deletion, erasure, or other destruction of
> records in the custody of the agency, and with the assistance of the Archivist shall
> initiate action through the Attorney General for the recovery of records the head
> of the Federal agency knows or has reason to believe have been unlawfully
> removed from that agency, or from another Federal agency whose records have
> been transferred to the legal custody of that Federal agency.

44 U.S.C. § 3106(a).  And second, if an agency head ignores this statutory mandate, the FRA

provides that "the Archivist shall request the Attorney General to initiate such an action, and

shall notify the Congress when such a request has been made."  Id. § 3106(b).

And what if *both* the agency head and Archivist stand idle in the face of a known FRA

violation?  Although the FRA does not itself empower "private litigants [to] state a direct claim

for legal relief under the FRA," the D.C. Circuit has held that, for certain types of claims, "the

APA can provide a jurisdictional hook for a suit alleging noncompliance with the FRA."

Citizens for Responsibility & Ethics in Washington v. Pruitt, 319 F. Supp. 3d 252, 257 (D.D.C.

2018) ("Pruitt") (discussing Armstrong v. Bush, 924 F.2d 282 (D.C. Cir. 1991)).  Thus, when

"both the agency head and Archivist 'fail[ ] to initiate remedial action in a timely manner, private

litigants may sue under the APA to require them to do so.'"  Tillerson, 293 F. Supp. 3d at 37

(quoting <u>Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Homeland Sec.</u>,

527 F. Supp. 2d 101, 110 (D.D.C. 2007)).

The FRA-via-APA private right of action is limited to certain types of challenges.  <u>See</u>

<u>Armstrong</u>, 924 F.2d at 291 ("[W]e find that there is APA review of [an agency's] recordkeeping

guidelines and instructions, but only limited APA review of claims that records are being

destroyed in violation of such guidelines.").  As Judge Boasberg explained in <u>Pruitt</u>, <u>Armstrong</u>

considered three types of agency actions under the FRA: "(1) agency employees' 'destroying

records in contravention of the . . . recordkeeping guidelines and directives'; (2) the agency's

failure to employ adequate recordkeeping guidelines and directives; and (3) the agency head's or

Archivist's refusal to seek the initiation of an enforcement action by the Attorney

General."  <u>Pruitt</u>, 319 F. Supp. 3d at 257 (quoting <u>Armstrong</u>, 924 F.2d at 291, 294–95).  "While

the first was not reviewable, [<u>Armstrong</u>] held that the APA provided a private right of action for

the latter two."  <u>Id.</u>  Thus, "courts may not entertain private suits alleging that agencies have

improperly destroyed or removed records, but they may consider ones challenging whether

agency guidelines that permit destruction of certain records are adequate under the FRA and ones

alleging that the agency head or Archivist improperly refused to seek initiation of an

enforcement action by the Attorney General."  <u>Id.</u> at 258.

So, what has Price alleged here?  Count 1, against the Attorney General, is best read as

raising the second two challenges that <u>Armstrong</u> and <u>Pruitt</u> held are subject to judicial review:

Price attacks both the Attorney General's failure to "maintain an active, continuing program for

the economical and efficient management" of records as required by 44 U.S.C. § 3102, Am.

Compl. ¶ 44, and his failure to either "notify the Archivist concerning the unlawful removal" or

"initiate legal action . . . to recover the records" as required by 44 U.S.C. § 3106, Am. Compl.

¶ 45.  Count 2 likewise complains that the Archivist violated his statutory duty under 44 U.S.C.

§ 3106 when he failed to "initiate any legal action to recover the records[.]"  Am. Compl. ¶ 55.

These are FRA claims that a private individual may properly press through the APA.  See Pruitt,

319 F. Supp. 3d at 257 (recognizing private right of action for (1) "agency's failure to employ

adequate recordkeeping guidelines and directives" and (2) "agency head's . . . refusal to seek the

initiation of an enforcement action" (citing Armstrong, 924 F.2d at 294–95)).

Count 4, on the other hand, runs afoul of Armstrong.  There, Price alleges that DOJ

violated the FRA "by and through the authorization, implementation, and on-going use of a

private recordkeeping system, known as the Child Protection System ("CPS") by the National

ICAC-TF Program."  Am. Compl. ¶ 78.  He contends that DOJ "authorized, funded, and

implemented the use of an external recordkeeping system as a deliberate means to effect a policy

and practice of the alienation, removal, and or destruction of federal records."  Id. ¶ 80.  And he

demands that DOJ stop using this recordkeeping system, id. ¶ 83, which is akin to "suing directly

to enjoin agency actions in contravention of" the FRA, Armstrong, 924 F.2d at 294.  Armstrong

made plain that judicial review is precluded for such suits.  See id.

Price seemingly tries to avoid this conclusion by recasting what appears to be an

improper removal claim, which is not judicially reviewable, as a policy or practice claim, which

is.  But Price points to no official, public policy at the root of this claim, instead complaining of

"de facto policies and practices," Am. Compl. ¶ 77, that together "impair [his] lawful access to

information," id. ¶ 81.  Nor does Price specify the way in which these de facto policies

contravene agency guidelines or the FRA.  At bottom, Count 4 invites "judicial assessment of

agency compliance in specific factual contexts"—namely, whether the agency has unlawfully

lost track of records relating to child sex crimes investigations—rather than an assessment of the

adequacy of the agency's recordkeeping guidelines as a general matter.  <u>Competitive Enter. Inst.</u>
<u>v. U.S. Envtl. Prot. Agency</u>, 67 F. Supp. 3d 23, 33 (D.D.C. 2014).  That species of claim is
unavailable to private plaintiffs under the FRA, and the APA cannot be leveraged to circumvent
that limitation.  <u>Id.</u> ("[P]rivate plaintiffs cannot rely on the APA to challenge what they are
expressly prohibited from challenging under FRA, *i.e.*, an agency's substantive decisions to
destroy or retain records.").

Price's complaint therefore alleges two judicially reviewable FRA-via-APA claims.  His
motion for a temporary restraining order and preliminary injunction, however, seems to press
only one of them: the 44 U.S.C. § 3106 claim that the Attorney General and Archivist must
initiate action to "seize, secure, or otherwise preserve the status quo of all records removed from
[their] custody[.]"  TRO Mot. at 22.  The other two demands in Price's motion relate to enjoining
Defendants from using "[Software-as-a-service-based], Could-based, or other non-government
owned or operated system" that "remove[s] [or] alienate[s] . . . records from the Defendants'
custody."  <u>See</u> <u>id.</u> (demands one and two).  As the Court explained in the preceding paragraph
discussing Count 4, this is akin to "suing directly to enjoin agency actions in contravention of
agency guidelines," and <u>Armstrong</u> made clear that such a claim is unavailable to private
litigants.  924 F.2d at 294.  The motion does not otherwise indicate a desire to press an
adequacy-of-recordkeeping-guidelines claim under 44 U.S.C. § 3102.  For the purposes of
resolving this motion, then, the Court need only consider the propriety of a temporary restraining
order with respect to Price's failure-to-act § 3106 claim against the Attorney General and
Archivist.

B.  Whether Injunctive Relief is Warranted

The Court can now proceed to analyze whether Price has established his entitlement to either a temporary restraining order or preliminary injunction with respect to this claim. Although these are ostensibly discrete claims—Count 1 is against the Attorney General, Count 2 the Archivist—they can be treated together since the same statutory provision governs each.

1.  *Likelihood of Success on the Merits*

The Court begins with the first factor for injunctive relief—whether Price has shown a substantial likelihood of success on the merits of his underlying claim.  There remains some "tension in the case law regarding the showing required on the merits" for injunctive relief. Pursuing Am.'s Greatness v. Fed. Election Comm'n, 831 F.3d 500, 505 n.1 (D.C. Cir. 2016) (requiring "substantial likelihood"); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (requiring "likely" success); Sherley v. Sebelius, 644 F.3d 388, 398 (D.C. Cir. 2011) (requiring "more likely than not").  There is also some question whether the required showing can even be fixed in a vacuum, or whether instead the "necessary showing on the merits is governed by the balance of equities as revealed through an examination of the other three factors." Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 844 (D.C. Cir. 1977).  Under the latter approach, a more persuasive showing on the merits may be required where the equities counsel against injunctive relief, while raising only a "serious legal question" on the merits may suffice if the other three factors support it.  Aamer v. Obama, 742 F.3d 1023, 1043 (D.C. Cir. 2014).  The Court need not hem and haw over the various standards and frameworks, for the result remains the same under any of them: Price cannot establish a likelihood of success on the merits.

Price contends that both the Attorney General and Archivist have failed, as required by 44 U.S.C. § 3106, to initiate action to recover the allegedly unlawfully removed or alienated records. To show a likelihood of success on this claim, Price must convincingly (1) identify records that fall under the FRA; (2) allege that those records are being removed or destroyed in violation of the FRA; and (3) allege that the relevant agency head (here, the Attorney General) and/or Archivist knew about the FRA violations and yet failed to initiate corrective action.

Start with step one. The FRA requires heads of federal agencies to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." 44 U.S.C. § 3101. The FRA defines federal records as

> All recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of the data in them.

Id.

As is already clear, Price is focused on records kept by the Internet Crimes Against Children Task Force, a network of law enforcement authorities engaged in investigations and prosecution of offenses involving the exploitation of child victims. In a letter Price wrote to the Attorney General and Archivist notifying them of alleged FRA violations, Price describes them broadly as the "records [the DOJ] relied upon to obtain thousands of criminal convictions." Pl's Mot. to Extend Time to File Am. Compl., Ex. D, ECF No. 35 at 20. In his amended complaint, Price says the missing records "include but are not limited to emails, a collaborative message exchange, files, administrative subpoena records, 3rd-party database records, IP Address records, various 'hash values' e.g., SHA-1 values, MD-5 values, etc., and other historical records." Am.

Compl. ¶ 23.  Although the specific Counts alleging FRA violations do not add any more detail, his motion for injunctive relief seems to home in on the missing SHA-1 (or "secure hash algorithm version 1") values.  See TRO Mot. ¶ 9.  SHA-1 values, represented as 40-digit hexadecimal numbers, are "used as the basis for the Digital Signature that performs the same function as an analog, i.e., pen and ink, signature on physical evidence."  Id. ¶ 10.

Here it makes sense to briefly describe the role of SHA-1 values in child pornography investigations.  Law enforcement entities across the country, including federal agencies, use a software program called the Child Protection System ("CPS") to investigate the collection and distribution of child pornography through computer users linked via peer-to-peer software.  United States v. Naylor, 99 F. Supp. 3d 638, 639 (S.D.W. Va. 2015).[3]  In simple terms, CPS "allows law enforcement to search peer-to-peer networks for files containing terms associated with child pornography."  Id.  Files containing depictions of child pornography can be identified by their hash value, which is "essentially a digital fingerprint unique to a particular file."  Id. (internal quotation marks omitted).  Thus, law enforcement can cross-reference its database of hash values known to contain child pornography with those found corresponding to particular IP addresses to pursue suspected purveyors and consumers of child pornography.  See id. (describing how a West Virginia police officer "compare[d] the hash value of its holding with the hash values for the 29 files" found on suspect's computer).

Because hash values are essential to the DOJ's investigation and prosecution of suspected child pornographers, Price contends that the FRA requires DOJ to maintain them.  Reply ¶ 23. He points to the definition of "electronic record" in the regulations interpreting the FRA, which

---

[3] CPS was developed by TLO, Inc., though it is now managed by the Child Rescue Coalition ("CRC").

state that such a record "includes both record content and associated metadata that the agency

determines is required to meet agency business needs."  36 C.F.R. § 1220.18.  The regulations

further define "metadata" as "preserved contextual information describing the history, tracking,

and/or management of an electronic document."  Id.  Price believes the SHA-1 values qualify as

metadata that are essential to the agency's functioning: as a "digital fingerprint unique to a

particular file" of child pornography, Naylor, 99 F. Supp. 3d at 639 (internal quotation marks

omitted), it is crucial to the agency's efforts to identify, investigate, and prosecute suspected

offenders.

  That brings the Court to step two.  Assuming that Price has adequately described the

missing records, he then must show that such records are being removed from agency custody in

violation of the FRA.  Price argues that the DOJ violates the FRA by using programs like CPS—

what he describes generally as third-party software-as-a-service or cloud-based software

programs—because those programs do not maintain records in the manner required by the FRA

and other federal records laws.  And why did DOJ do this?  According to Price, DOJ  "devised a

stratagem to create federal records 'off-book' with the specific intent to thwart [federal records

laws], and to mislead the courts as to the true availability of the records" in the third-party

software and systems.  TRO Mot. ¶ 6.

  The government contests the adequacy of Price's allegations that DOJ is actively

violating the FRA through the use of CPS.  It argues that Price has failed to identify "the manner

by which the use of Software-as-a-Service based and cloud-based software violates the FRA."

Opp. to TRO Mot., ECF No. 59, at 6.  The government's response on this score highlights a

larger issue with its struthious approach to this case.  The government's primary litigation

strategy in this matter appears to be feigned ignorance: if we act like we don't know what this

*pro se* plaintiff is arguing, then perhaps neither will the Court.  The government repeatedly asserts that it cannot divine what Price is arguing, thereby avoiding substantive engagement with the various statutory provisions in play.  But while the government struggles to identify the bases for Price's claims, the Court does not find them all that difficult to discern.  For example, the government faults Price for allegedly "fail[ing] to explain the 'non-discretionary duties' compelling" the Archivist and Attorney General to take action, but Price's complaint cited *and explained* the appropriate statutory provision that so compels them.  See Am. Compl. ¶¶ 39–50 (detailing 44 U.S.C. § 3106's requirement of agency head action in Count 1 against Attorney General); id. ¶¶ 51–57 (same in Count 2 against Archivist).

Likewise on this issue, the problem for Price is *not* (as the government would have it) that he has failed to chart a reasonably coherent path to relief.  He has.  He argues that, assuming federal law enforcement can use third parties to create and maintain records used in federal prosecutions at all, it can do so only to the extent such records are kept in compliance with federal records laws.  And here, Price submits, the third parties have not done so, because they have (according to him) failed to keep track of essential metadata and various other records related to prosecutions.  See TRO Mot. ¶ 11 (complaining that Defendants claimed not to possess SHA-1 values that "under the statutes [they] were required to have created or received").

But just as a blueprint does not equal a building, a recognizable theory does not equal a substantial likelihood of success on the merits.  When the Court considers Price's *evidence* for his claim that the DOJ does not maintain records essential to its prosecutions, it concludes that he comes up short.  Price says his evidence in support of his allegation that the DOJ is actively violating the FRA is four-fold:

> (1) the exhibit evidence; (2) the sworn affidavits of Derek Dubner, General Counsel for TLO/CRC, and William Wiltse, Director of Law Enforcement

14

Operations for TLO/CRC regarding the operation of their software exclusively for the Defendants' program participants (law enforcement); (3) the court's records in the cases cited as evidence of the Defendants' conduct; and (4) the statutes and regulations before this Court.

Reply ¶ 29.  The Court examines these in turn.

*Exhibit Evidence.*  Price attached to his motion for injunctive relief roughly 500 pages of exhibits.  The first two exhibits, totaling well over two hundred pages, are "Standard" publications by the National Institute of Standards and Technology that discuss secure hash standards, including the SHA-1 values at issue in this case, and digital signature standards.  See TRO Mot., Exs. A–B, ECF Nos. 52-1, 52-2.  These documents are part of "the official series of publications relating to standards and guidelines adopted and promulgated under the provisions of" the Federal Information Security Management Act ("FISMA"), 44 U.S.C. §§ 3551 *et seq.* Ex. B at 3.  While they provide a detailed breakdown of what secure hash values and digital signatures are, and how they should be used consistent with FISMA, they do not themselves show that DOJ violated the FRA.  For the same reasons, Exhibits D and E—which are Wikipedia entries for SHA-1 and digital signatures, respectively—also do not provide evidence of an FRA violation.  See ECF Nos. 52-4, 52-5.

Another set of exhibits attached to Price's motion for injunctive relief, G through I, consists of probable cause affidavits provided in support of search warrants.  ECF Nos. 52-7–52-9.  One exemplifies all three.  See Ex. I at 19 ("Law enforcement, using investigative software, observed IP address 50.143.14.40 advertising approximately thirty-six (36) unique files with SHA-1 hash values consistent with child pornography files[.]").  Price, ostensibly, uses these affidavits to show the role that third-party software services in general, and SHA-1 values in particular, play in the investigation of suspected child pornographers.  But as Price himself seems to acknowledge, these affidavits, at most, show that SHA-1 values and other information

contained in them likely meet the definition of records in the FRA, not that the DOJ is *violating* the FRA.  See TRO Mot. ¶ 12 (reciting definition of records in 44 U.S.C. § 3301 and arguing that it covers "all items and forms of record referenced in the affidavits").

Then there are exhibits that Price attached to the various complaints he has filed in this case.  One of these is a FOIA request, assigned the tracking number (referred to in the party's submissions) 17-00209, in which Price sought "any and all reports, documentation, and data by the Internet Crimes Against Children ('ICAC') Task Force for case number 11-7890."  See ECF No. 13, Ex. A.[4]  The same request *specifically* asked for "any and all reports, documentation and information specifically regarding SHA-1 data, by the Internet Crimes Against Children ('ICAC') Task Force for" the same case number.  Id.  The agency's search, conducted by the Office of Justice Programs ("OJP"), returned 26 pages of responsive records, but yielded no responsive documents regarding the SHA-1 data Price sought.  See ECF No. 13, Ex. C.  In addition, Price references several other FOIA requests, Am. Compl. ¶¶ 15–20 (citing Exhibits H, L, and O, available at ECF No. 13), which he says unsuccessfully sought records the DOJ "was required to collect and preserve under the statutes."  Am. Compl. ¶ 20.

These exhibits establish at most that Price had ample reason to file his initial FOIA lawsuit, but they do not establish that DOJ is likely committing FRA violations.  Price has put the cart before the horse.  Without knowing *how* DOJ searched for the records Price requested, the Court cannot say with any certainty that the agency—again, assuming it must maintain them—has lost access to them altogether.  Many questions need answering before jumping to

---

[4] This document is titled "Amended Complaint" on the docket but is not the operative complaint for purposes of this motion.  To avoid confusion, the Court does not provide the document title in its citation to this docket entry.

that conclusion.  What, if any, categories of records did the agency exclude from its searches?[5]

What search terms did DOJ use?  Were the agency's searches conducted by the proper

custodians?  Did the agency search the proper locations?  Did it request any records from the

Child Rescue Coalition, who runs the CPS program?  Can one even expect metadata, like SHA-1

values, to be returned via FOIA requests?  Until search issues like these are explored through

ordinary FOIA litigation, it is hard to know whether the DOJ's responses to Price's requests to

date reveal much of anything about the agency's compliance with (or violation of) the FRA.

The same is true for potential exemptions.  Without knowing what responsive records, or

parts of records, the agency determined were exempt, it is nigh impossible to determine what

records the agency actually has in its possession.  For example, in its response to FOIA Request

---

[5] As one example, OJP informed Price, in responding to FOIA Request No. 17-00209, that Congress "excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA," and that its "response is limited to those records that are subject to the requirements of the FOIA."  ECF No. 13, Ex. C (citing 5 U.S.C. § 552(c)). Section 552(c)(1) provides:

> Whenever a request is made which involves access to records described in subsection (b)(7)(A) and—
>
> (A) the investigation or proceeding involves a possible violation of criminal law; and
>
> (B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,
>
> the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.

Given that Price more than once sought records relating to a specific criminal case, and given that many of his requests targeted information relating to criminal investigations more generally, it seems possible that the minimal responses he received are explained by the exclusion embodied in § 552(c), as opposed to some unlawful and nefarious recordkeeping practice.

17-00209—seeking records relating to a particular case and to the ICAC-TF more generally—the agency redacted "jurisdictional identifiers" and "record numbers" pursuant to the personal privacy exemption embodied in 5 U.S.C. § 552(b)(6), which excepts from disclosure files "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  See ECF No. 13, Ex. C.  Similarly, in response to a "3rd-Party FOIA request," in which Price sought "case specific records, documents, information, and data regarding" a particular individual, the DOJ, according to Price, "refused to produce the records[,] citing exemptions under 5 U.S.C. § 552(b)(7)(E) and (b)(7)(F)."  Am. Compl. ¶ 21.  Those exemptions permit withholding, respectively, of information that would "disclose techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law" or "could reasonably be expected to endanger the life or physical safety of any individual."  Given that this case stems from Price's desire to excavate the techniques used by law enforcement in the investigation and prosecution of child sex crimes, and that it seeks law enforcement records that are not personal to him, it seems inevitable that the privacy and law enforcement exemptions will swallow up massive swaths of the records he seeks.[6]

---

[6] The "3rd-Party FOIA request" raises yet another issue: whether Price would be able to access through FOIA many of the records he sought, given that they are law enforcement records that may relate to third parties.  If any of the records Price seeks contain "information that would show that someone else . . . has ever been the subject of a criminal investigation or was even mentioned in a criminal file . . . in almost all cases DOJ will respond by stating that it will 'neither confirm nor deny' the existence of responsive law enforcement records."  Department of Justice, *FOIA Frequently Asked Questions*, https://www.justice.gov/usao/resources/making-foia-request/foia-frequently-asked-questions (response to "What about requirements for obtaining records on someone else?").  Just once Price indicates that he obtained a waiver of privacy rights, which would obviate that obstacle, but it is unclear how regularly he did so and how often his requests would run into this problem—yet another reason why these issues should be vetted

The Court could go on but trusts the point is clear enough: Price can challenge the who, what, where, and how of the search, along with the propriety of any exemptions, under FOIA law.  Depending on how that litigation plays out, Price may come to find that the DOJ in fact possesses the very records Price suspects they have failed to keep, but that he also has no right to access them.  Or he may find otherwise, and in the process gather more potent ammunition for his FRA grievances.  In any event, until that happens, it would be a fool's errand to assess whether DOJ has complied with the FRA by reference to the scattershot FOIA exhibits attached to Price's pleadings.

*Sworn Affidavits*.  Price also suggests that two affidavits provided by employees of TLO, Inc., the company that developed and used to run CPS, support his claim that the DOJ is engaged in ongoing FRA violations.  Price is mistaken.  In <u>United States v. Ocasio</u>, No. 11-CR-02728-KC (W.D. Tx. Mar. 26, 2013), it is true that both Derek Dubner and William Wiltse, then-employees of TLO, submitted affidavits at the government's request, in which they averred that federal law enforcement used CPS software to combat Internet-based child pornography.  <u>See</u> Ex. M, ECF No. 52-13 at 7–9, 14–18.  Both Dubner and Wiltse also offered reasons why they did not want to subject their software, particularly the "source code," to forensic examination.  Ex. M. at 8.  These affidavits, however, merely confirm an unremarkable and uncontested proposition: that federal law enforcement leverages third-party software programs in its efforts to track down and prosecute child pornographers.  It does not establish that the use of programs like CPS itself

---

through full FOIA briefing before trying to glean significant takeaways about the agency's FRA compliance from the FOIA exchanges between the parties.

constitutes an FRA violation.[7]  What Price needs the affidavits to do, but what they do not do, is provide evidence that the CPS software suite creates and maintains records in a manner that violates federal law.

*Court Records*.  Next, Price cites several federal cases in which the government voluntarily dismissed charges when it became clear it would have to subject the third-party software it used in the investigations to forensic examination.  TRO Mot. ¶ 3.  In United States v. Hartman, No. 15-CR-00063-JLS (C.D. Ca. Jan. 21, 2016), for example, the court granted Hartman's motion to compel discovery of the software.  Hartman, Order, ECF No. 87.  The government requested more time to comply with the order, acknowledging that "items pivotal to the required testing are in the possession of a non-governmental entity and the government must consult with this private entity" to obtain "the key software and data."  Hartman, Status Report, ECF No. 102.  But rather than producing that software and data, it opted instead to drop the charges.  Based on Hartman and other cases like it, Price argues that "[w]hen [criminal] defendants moved to compel production of 'the records alleged' in the supporting affidavits, indictments, and inspection of the software that created the alleged records, the Defendants dismissed the indictments to avoid exposure of their violations of the law."  TRO Mot. ¶ 4.

Although Price has offered *one* way of interpreting what happened in those cases, the Court is not convinced that it is the *likely* explanation.  For one, the government may have decided to drop charges in some cases because it feared that forensic examination of its third-party software tools would cause the disclosure of confidential techniques that would enable future criminals to evade capture.  See Gillum, supra 3 n.2 (portion quoting cybercrime expert

---

[7] The same is true of Exhibit J, records of a proceeding in United States v. Noden, No. 8:16-CR-0283-LSC (D. Neb. Apr. 20, 2017).

and professor Orin Kerr).  For another, the government may be bound by contract *not* to make certain disclosures that, if ordered by a court in a criminal case, either require it to dismiss the underlying charges or breach the contract and lose access to the software systems in the future. Id.; see TRO Mot., Ex. M (TLO employee Dubner discussing importance of protecting CPS's source and object code).  Yet even if the government did drop charges in those cases to "avoid exposure of their violations of the law," as Price contends, those violations seem far more likely to concern the propriety of the government's investigation under the Fourth Amendment or its compliance with federal evidence law than some cover-up of FRA noncompliance.  At the end of the day, those cases show what the other exhibit evidence (including the affidavits) shows: that law enforcement uses third-party software tools like CPS.  But they do not show that the use of CPS necessarily equates to an FRA violation.

*Statutes and Regulations*.  The finals fragments of proof Price offers in support of his motion for injunctive relief are citations to various federal statutes and regulations.  For instance, Price contends that 18 U.S.C. § 2258A and 42 U.S.C. § 5773(b) require DOJ to submit SHA-1 values to the National Center for Missing and Exploited Children, TRO Mot. ¶ 11, and that any records the DOJ creates and maintains must comply with the FISMA provisions in 44 U.S.C. §§ 3551–59, id. ¶ 14.  Simply identifying laws that establish recordkeeping requirements does not do the trick for Price, since all that may show is that some of the records he complains are missing may well qualify as records under the FRA.  Take his FISMA argument.  Even accepting that Price has accurately represented the statutory scheme—that the FRA incorporates FISMA, meaning that anything FISMA requires, the FRA requires—that just goes to show that the allegedly missing records are subject to federal records laws.  Yet as with much of what Price has alleged and produced as evidence, it does not show that the DOJ is violating the FRA.  The

Court has already indicated that it accepts, at this early juncture and with no counterargument by the government, Price's contention that hash values fall within the definition of federal records for DOJ.  It also accepts Price's contention that an amalgam of federal laws mandate the creation and maintenance of certain types of metadata.  But it cannot accept Price's contention that the records kept by DOJ are not FISMA-compliant or otherwise in violation of federal law just because Price says so.

Therefore, after carefully combing Price's complaint, the briefs related to his motion for injunctive relief, and the copious accompanying exhibits, the Court concludes that Price has failed to show the DOJ is actively violating the FRA.  For this reason, he has not shown a substantial likelihood of success on the merits.

Although the Court could end its analysis of the first factor here, it will explore a further reason why Price's theory of relief may not hold up.  Recall what Price must accomplish to establish a likelihood of success on the merits on a 44 U.S.C. § 3106 claim.  He must make a clear showing (1) that the records he is complaining about fall under the FRA; (2) that those records are being removed or destroyed in violation of the FRA; and (3) that the relevant agency head (here, the Attorney General) and/or Archivist knew about the FRA violations and yet failed to initiate corrective action.  The Court has already concluded that Price's argument falters at the second step.  Yet, even if Price had made an adequate showing that specific types of records related to criminal prosecutions were being removed from DOJ custody in violation of the FRA, the Court doubts he could carry his burden at step three.

The core issue here is whether Price can establish that either the Attorney General or the Archivist knew of an FRA violation and is therefore under any statutory duty to act.  For although agency *in*action is amenable to judicial challenge under the APA, that is so only where

a particular action is mandated by law and the agency has refused to take it.  <u>Judicial Watch, Inc.</u> <u>v. Kerry</u>, 844 F.3d 952, 954 (D.C. Cir. 2016) ("[T]he Administrative Procedure Act permits a claim 'that an agency failed to take a *discrete* agency action that it is *required to take*.'" (quoting <u>Norton v. S. Utah Wilderness All.</u>, 542 U.S. 55, 64 (2004)); <u>see</u> 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]").

It is not clear to the Court that either the agency head or the Archivist is yet under any duty to act.  As the Court understands § 3106, which anchors Price's attempt to compel the Attorney General or Archivist to act, neither individual must act until they know of an actual or impending FRA violation.  Only then has the Attorney General or the Archivist "failed to take a discrete agency action that it is required to take" under the FRA.  <u>Kerry</u>, 844 F.3d at 954.  A short review of § 3106 shows why.  It provides that the "head of each Federal agency shall notify the Archivist of any actual, impending, or threatened unlawful removal . . . or other destruction of records in the custody of the agency" and "shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed from that agency[.]"  44 U.S.C. § 3106(a).  Hence, an agency head, once he knows records are being unlawfully removed, must (1) notify the Archivist and (2) enlist the aid of the Attorney General in recovering the lost records.  The FRA further commands that, if the agency head does not take such action, the "Archivist shall request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made."  <u>Id.</u> § 3106(b).  The Archivist's twin duties in the event of a known (and unresolved) FRA violation are to (1) request the aid of the Attorney General and (2) notify the Congress that an agency is violating the FRA.  But the Attorney General's duties (as the relevant agency head in this case)

to notify the Archivist of the destruction of records and implement remedial action attach only after he has identified the *unlawful* "actual, impending, or threatened" removal of records.  See id. § 3106(a).  Ditto for the Archivist's mandate to request the Attorney General to "initiate such an action"—he is under no statutory duty to do so unless he knows of any "actual, impending, or threatened unlawful removal . . . of records[.]"  Id.  Thus, plaintiffs like Price must plausibly allege that the relevant agency head and Archivist know about an FRA violation in order to plausibly allege that they should be compelled to take action under § 3106; merely alleging an FRA violation by itself will not suffice.

Judge Boasberg's decision in Pruitt reinforces this reading of § 3106.  There, the court considered whether plaintiffs had adequately stated an APA claim under another section of the FRA, 44 U.S.C. § 2115, which provides in relevant part:

> When the Archivist finds that a provision of any such chapter has been or is being violated, the Archivist shall (1) inform in writing the head of the agency concerned of the violation and make recommendations for its correction; and (2) unless satisfactory corrective measures are demonstrably commenced within a reasonable time, submit a written report of the matter to the President and the Congress.

Judge Boasberg concluded that the plaintiffs had not stated a claim under § 2115 because the "when" condition had not been satisfied.  "Plaintiffs' failure to allege that the Archivist made any actual finding of a violation—the condition precedent for § 2115's obligations—is fatal to Count III."  Pruitt, 319 F. Supp. 3d at 262.  As it was with § 2115, so it should be with § 3106: "[t]he finding of a violation is . . . a condition precedent to the [Attorney General's and] Archivist's statutory obligation to act."  Id. at 261.

To be sure, there are textual differences between § 2115 and § 3106 that, one could argue, command different interpretations.  Most importantly, the former, unlike the latter, is clearly stated in the conditional tense.  Compare 44 U.S.C. § 2115 ("When the Archivist finds

. . . .") with id. § 3106(a) ("The head of each Federal agency shall notify the Archivist of any actual, impending, or threatened unlawful removal . . . ."). Even so, the D.C. Circuit in Armstrong and other courts in this district appear to construe § 3106 as creating a conditional obligation. The Armstrong court explained § 3106 as follows: "[O]nce the agency head becomes aware of '*any* actual, impending, or threatened'" unlawful removal of records, "the agency head '*shall* notify the Archivist' and 'with the assistance of the Archivist *shall* initiate action through the Attorney General.'" 924 F.2d at 296 (quoting § 3106) (first emphasis added). In Cause of Action v. Pompeo, Judge McFadden read § 3106 similarly: "*When* the head of a federal agency 'knows or has reason to believe' that federal records 'have been unlawfully removed' from agency custody, he has a duty to 'initiate action through the Attorney General for the recovery of [the] records." 319 F. Supp. 3d 230, 232 (D.D.C. 2018) (quoting § 3106) (emphasis added and alteration in original). The upshot of those formulations? Neither the Attorney General nor the Archivist is under *any* duty to act until the "once" or "when" condition—knowledge of unlawful removal of records—is satisfied. Put another way, § 3106 imposes no duty upon either the Attorney General or Archivist to *find* that an agency has removed records in violation of the FRA; it *does* impose mandatory duties upon each of them *if* they know that such unlawful removal of records has occurred, is occurring, or will occur.

Notwithstanding their textual differences, it would make little sense to read § 3106 differently than § 2115. Both provisions deal with what actions must be taken in the event of an FRA violation, although § 2115 applies only to the Archivist, not agency heads, and deals only with his obligation to report violations and "make recommendations for [their] correction," not initiate action to enjoin them. If, as Pruitt held, a condition precedent to suing the Archivist for violating § 2115's reporting obligations is an actual finding of an FRA violation *by the Archivist*,

why would such a finding not be required as a condition precedent to suing agency heads or the Archivist for violating § 3106's recovery obligations?  That would mean a private litigant could sue for the more drastic remedy—compelling the agency head or Archivist to take corrective action, as § 3106 requires—based on their *own, unilateral* allegation of an FRA violation, but that same litigant could not sue to enforce the more modest requirement—compelling the Archivist "make recommendations" to the offending agency on how to correct the violation and report the violations to the President and the Congress, as § 2115 requires.  The Court doubts Congress envisioned such a peculiar statutory scheme.

The D.C. Circuit's choice of words in describing <u>Armstrong</u>'s holding that some limited judicial review is available under § 3106 provides further support for the Court's reading. Although the court found that § 3106's "clear statutory language mandating that the agency head and Archivist seek redress for the unlawful removal or destruction of records" provided a basis for judicial review, the court held that such review was confined to "the agency head's and Archivist's *enforcement actions*."  <u>Armstrong</u>, 924 F.2d at 296 (emphasis added).  It used similar language throughout the opinion.  <u>See, e.g.</u>, <u>id.</u> at 295 (judicial review permitted for "refusal to seek the initiation of an enforcement action"); <u>id.</u> (judicial review permitted for "failure to take enforcement action").  The court said nothing about the propriety of judicial review of the agency head or Archivist's determination that there was an unlawful removal or destruction of records in the first instance.

Finally, a requirement that the agency head or Archivist must first have actual knowledge that records are being *unlawfully* removed or destroyed before either can be sued for violating § 3106 ensures that courts don't entertain the cause of action that <u>Armstrong</u> held was unavailable to private litigants.  Were it otherwise—if that condition did not need to be

satisfied—a plaintiff could easily circumvent <u>Armstrong</u>'s holding that a direct action to force an agency to stop destroying records, or to retrieve ones already lost, is unavailable under the FRA. <u>Armstrong</u> made clear that "courts may not entertain private suits alleging that agencies have improperly destroyed or removed records, but they may consider . . . ones alleging that the agency head or Archivist improperly refused to seek initiation of an enforcement action by the Attorney General."  <u>Pruitt</u>, 319 F. Supp. 3d at 258 (discussing <u>Armstrong</u>, 924 F.2d at 294–95). Thus, a private litigant cannot sue to stop an agency from removing or destroying certain records, but she can sue to compel recovery efforts by an agency head and/or the Archivist.

But, of course, the FRA requires agency heads and the Archivist to take corrective action *only if* records have been improperly destroyed or removed.  In other words, to succeed on a § 3106 claim, a plaintiff must first establish that records have been destroyed or removed from agency custody in violation of the FRA.  And if a plaintiff's unilateral declaration that records have been unlawfully destroyed—rather than an agency's express or implied acknowledgement of such a violation—is enough to get a § 3106 claim off the ground, the D.C. Circuit wasted its breath when it prohibited private actions "to prevent an agency official from improperly destroying or removing records."  <u>Armstrong</u>, 924 F.2d at 294.  That is so because a plaintiff could secure judicial review for that very claim simply by adding the *further* demand that an agency head or the Archivist initiate action to recover the allegedly missing records.  That would require federal courts to decide whether an FRA violation has occurred in the first instance—a question not just the D.C. Circuit, but also the Supreme Court has said is unfit for judicial review.  <u>See</u> <u>Kissinger v. Reporters Comm. for Freedom of the Press</u>, 445 U.S. 136, 149–50 (1980) ("Thus, regardless of whether Kissinger has violated the [FRA] and Records Disposal Act[ ], Congress has not vested federal courts with jurisdiction to adjudicate that question upon

suit by a private party.  That responsibility is vested in the administrative authorities."); accord

True the Vote, Inc. v. IRS, No. CV 13-734 (RBW), 2014 WL 4347197, at *5 (D.D.C. Aug. 7,

2014) ("[E]ven if there has been a Federal Records Act violation, the current action before this

Court is not the appropriate vehicle to determine whether such a violation occurred.").

The court in Judicial Watch, Inc. v. National Archives and Records Administration, 845

F. Supp. 2d 288, 302 (D.D.C. 2012), recognized, and avoided, this perversity in the PRA context.

In that case, Judicial Watch sought to compel the Archivist to recover records purportedly

subject to the Presidential Records Act ("PRA").  Analogizing the PRA enforcement scheme in

44 U.S.C. § 2112(c) to the FRA enforcement scheme in 44 U.S.C. § 3106, Judge Berman

Jackson declined Judicial Watch's invitation, reasoning that the "only enforcement tools

provided to the defendant under the PRA are committed to the agency's sole discretion."  Id.

The analogy of § 3106 to § 2112(c), for the same reasons explained with respect to § 2115, is not

a perfect one; the latter two provisions are clearly written as conditionals, while § 3106 is not.

See 44 U.S.C. § 2112(c) ("When the Archivist considers it to be in the public interest . . . .").[8]

Nevertheless, the court reasoned, Judicial Watch's request "essentially asks the Court to compel

defendant to determine that a violation has occurred and enforce the PRA," which "is not

permissible under the APA."  Judicial Watch, 845 F. Supp. 2d at 302.  The same is functionally

true here of Price's request: by asking the Court to compel the Attorney General and Archivist to

take action under § 3106, he is asking them *first* to determine that a violation has occurred—

which § 3106 does not mandate—and only *second* to take the enforcement action that § 3106

does mandate.  The APA does not permit a plaintiff to compel agency action unless that action is

---

[8] Again, though, the Court cannot understand what sense it would make for § 3106 to be read differently than essentially every other enforcement provision in the FRA and the PRA.

mandated by statute.  Kerry, 844 F.3d at 954 ("[T]he Administrative Procedure Act permits a

claim 'that an agency failed to take a *discrete* agency action that it is *required to take.*'" (quoting

Norton v. S. Utah Wilderness All., 542 U.S. 55, 64 (2004)).  Accordingly, the Court concludes

that a predicate to a viable § 3106 failure-to-act claim is a plausible allegation that the applicable

agency head or Archivist knows that records are indeed being removed or destroyed in

contravention of agency policy or the FRA.

On this view of § 3106, Price's claim is premature.  He has not plausibly alleged that

either the Attorney General or the Archivist found an actual, threatened, or impending unlawful

removal or destruction of records.  All he has alleged is that *he* "provided formal notice of the

DOJ's past and on-going violations of the FRA" to the Attorney General and Archivist, and that

the Chief Records Officer of NARA responded that "he was unaware of the DOJ's violations."

Am. Compl. ¶ 22.  After Price followed up with "additional information, including copies of the

statutes and citations from internal DOJ documents and details of records alienated, removed, or

destroyed in non-governmental systems," NARA responded "that based on the additional

information, further investigation would be required."  Id. ¶ 23.  This does not amount to an

allegation that the Attorney General or Archivist knows that records are being destroyed in

violation of the FRA.  Instead, it is functionally identical to what the Pruitt court found

insufficient to trigger mandatory action by either the agency head or the Archivist.  There,

CREW "sent a letter notifying [the Archivist] of what *it thought* were FRA-compliance issues,"

but the "Archivist [never] replied or indicated in any way that a violation had occurred."  Pruitt,

319 F. Supp. 3d at 262.  That NARA indicated it had investigated the matter and was preparing a

response to CREW's concerns was of no moment, because that did not amount to "any actual

finding of a violation."  Id.  Just so here: that the agency responded to Price that it was looking

into his allegations is not tantamount to acknowledging an FRA violation has occurred or is occurring.

It might be asked—though it is not discussed by the parties in their submissions, like most of the issues pertinent to this motion's resolution—why this was not an issue in cases like Kerry and Pompeo.  The reason is simple: both those cases were decided by the district court on mootness grounds, on the theory that the agency's corrective efforts had fulfilled their statutory mandate under § 3106.  But the very fact that the agency had taken *some steps* toward correcting for the removal of the records at issue (former Secretary of State Colin Powell's emails in Pompeo and former Secretary of State Hillary Clinton's in Kerry) quite obviously functioned as an acknowledgement that those records *should* be in the agency's possession.  See Kerry, 844 F.3d at 953 ("Although the current Secretary (with the help of the National Archivist) has made efforts to recover those emails . . . ."); Pompeo, 319 F. Supp. 3d at 233 ("The Government then requested additional time to respond . . . to enable more extensive efforts to obtain the emails."). Likewise in CREW v. SEC, 916 F. Supp. 2d 141, 150 (D.D.C. 2013), the SEC had already taken a series of actions in response to the alleged destruction of records, which meant the court had only to consider whether the response was sufficient to satisfy § 3106, because the agency's initial response functioned as a de facto finding of an FRA violation.  A similar acknowledgement—formal or informal, explicit or implicit—is lacking so far in this case. Accordingly, Price cannot show that the condition precedent to § 3106's mandatory duties has been satisfied.  For this reason, too, the Court would find that Price cannot establish a likelihood of success on the merits.

The Court well understands that a plaintiff may be entitled to injunctive relief "based on less formal procedures and on less extensive evidence than in a trial on the merits."  Cobell v.

Norton, 391 F.3d 251, 261 (D.C. Cir. 2004).  And the Court acknowledges that the bar a plaintiff must clear to show a likelihood of success on the merits is in many cases, including this one, far from clear.  Even so, "[a] preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  Id. at 258 (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).  Here the Court is simply unconvinced that Price has made that clear showing on the first factor.

### 2.  Irreparable Harm

Price's failure to establish a likelihood of success on the merits is not necessarily fatal to his quest for injunctive relief.  Under the traditional sliding-scale approach in this Circuit, Price might be able to compensate for his weak showing on one factor by making an "unusually strong showing on" another factor.  Davis v. PGBC, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009).  True, the Supreme Court's decision in Winter v. NRDC, 555 U.S. 7 (2008), has called into question this hydraulic approach and suggested that the merits and irreparable harm factors are "independent, free-standing requirement[s]," Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011), but the Circuit has yet to take a firm position on the matter—and so neither will this Court.

Assuming Price could salvage his request for injunctive relief with a strong showing on this factor, he nevertheless fails to make such a showing.  "To be entitled to preliminary injunctive relief, a plaintiff must show injury that is certain, great, actual, and imminent."  Mylan Labs., Ltd. v. FDA, 910 F. Supp. 2d 299, 313 (D.D.C. 2012) (citing Wis. Gas. Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Price cannot show that, "absent injunctive relief," he is likely to suffer certain harm, so the Court stops its analysis there.  Id.

Price says his injury is certain because once the records are placed in a third party's custody, they "are no longer available or accessible to the Plaintiff under FOIA/[the Privacy Act]." TRO Mot. ¶ 24.  This is unconvincing, for the same reasons that plagued Price's FRA argument on the merits.  The Court cannot say with any certainty whether the records Price sought in his FOIA requests are unavailable because of some unlawful recordkeeping practice relating to the DOJ's use of third-party software systems like CPS.  Just as likely, if not more likely, is that the records Price sought merely appeared unavailable under FOIA because of improper search methods (which Price can probe via his FOIA claims) or that such records exist but are exempt from disclosure under FOIA, perhaps because of the aforementioned carve-outs for records relating to law enforcement investigative techniques, see 5 U.S.C. § 552(b)(7)(E), and records whose release would amount to an unwarranted invasion of privacy, see id. § 552(b)(6).  See supra 17–18.  As a result, the Court cannot conclude that the injunction Price seeks—forcing the agency to stop using programs like CPS and to "preserve the status quo of all records," TRO Mot. at 22—will have any effect on the universe of records Price may be able to recover via FOIA.  It likewise cannot conclude that, absent an injunction, Price is certain to suffer the harm he alleges.  That dooms his irreparable harm argument.

### 3.  Balance of the Equities and the Public Interest

The third and fourth factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  Under these factors, the Court "weighs the harm to [Price] if there is no injunction against the harm to the [government] if there is." Pursuing Am.'s Greatness, 831 F.3d at 511.

As the Court has explained, Price's harm argument is tenuous.  The sinister scenario he sketches—wherein the government willfully alienates or destroys, or allows to be alienated or

destroyed, records relating to criminal prosecutions to conceal its investigative misconduct—is hard for the Court to swallow. The government must maintain those sorts of records during criminal prosecutions, for if it is unable to produce them or otherwise certify their existence and integrity, then it may be forced to drop charges when courts order that such records (or the software systems that create and maintain those records) be produced for inspection at trial. The several cases cited by Price where the government has been forced into that position show as much. See TRO Mot. ¶ 3 (citing, *inter alia*, United States v. Hartman, No. 15-CR-00063-JLS (C.D. Cal. Jan. 21, 2016)).

But even if the Court takes it as a given that records relating to child pornography investigations will be lost (potentially for good) so long as the government is permitted to continue using third-party software programs like CPS, it strikes the Court that there might be enormous countervailing costs to requiring federal law enforcement to stop using such programs. The Child Rescue Coalition—which owns CPS, one of several third-party software tools used by the government—reports that CPS's technology helped lead to the arrest of over 1,300 child sexual predators in 2018 alone. See Child Rescue Coalition, Annual Report 2018, https://childrescuecoalition.org/wp-content/uploads/2019/04/CRC_Annual-Report.pdf. Although the Court cannot say what number of those arrests (and subsequent prosecutions) were carried out by federal authorities, it is reasonable to assume that enjoining the government from using CPS and other like programs will hinder its ability to bring child sex criminals to justice.[9]

---

[9] Price asserts without support that any government contention that third-party software systems are "necessary to the successful interdiction of drug crimes, financial crimes, crimes against children, or any other type of crime is equally self-serving and false." TRO Mot. ¶ 34. Maybe, but maybe not. But the fact that the government chooses to use these tools suggests they are at least useful, if not strictly necessary, and Price has provided the Court with no reason, beyond his unsupported assertion, to conclude otherwise.

Price himself argues that the government's use of these programs is extensive; their widespread use implies at least some degree of efficacy.  See, e.g., TRO Mot. ¶ 3 ("Defendants routinely sought criminal indictments based . . . on records . . . removed or alienated from the Defendants' custody[.]"); id. ¶ 10 n.5 (alleging records are missing for "10s of 1000s of convictions").  Thus, while Price tries to reassure the Court that "[t]he relief sought by [him] does not stop the Defendants from conducting lawful operations," but "merely enjoins the Defendants from the unlawful use of systems designed to thwart the law," id. ¶ 37, the Court cannot know to what extent the government's enforcement efforts are dependent on the use of third-party programs that Price contends is unlawful.  Put simply, even assuming Price has a "right . . . to inspect records, documents, information, and data that were created, collected, and required to be preserved under the law," id. ¶ 30, and that the government is violating that right, it is far from evident that such an interest is greater than the government's keen interest in effectively combating child sex crimes.

*     *     *

Because neither one factor independently nor all four factors taken together counsels clearly in favor of granting Price injunctive relief, the Court will deny both his request for a temporary restraining order and a preliminary injunction.  The Court adds, however, that it will expect more from the government as this litigation progresses to briefing on dispositive motions. While the government may want to wish away this lawsuit, it would be well-advised to take it seriously, because Mr. Price certainly has—and it shows in the quantity and quality of the submissions thus far in the case.

## IV. Conclusion

For the foregoing reasons, the Court will deny Mr. Price's motion for a temporary restraining order and preliminary injunction.  A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  June 19, 2019