# EXHIBIT

# A

350 Fifth Avenue, 34th Floor
New York, NY 10118-3299
Tel:   212-290-4700
Fax:   212-736-1300; 917-591-3452

H U M A N

R I G H T S

W A T C H

**HRW.org**

**US PROGRAM**

Nicole Austin-Hillery, *Executive Director*
Sara Darehshori, *Senior Counsel*
Dreisen Heath, *Senior Coordinator*
Elizabeth Kennedy, *Researcher*
Rachel Kent, *Press Officer*
Clara Long, *Senior Researcher*
Megan McLemore, *Senior Researcher*
Grace Meng, *Senior Researcher*
Alison Leal Parker, *Managing Director*
Laura Pitter, *Senior National Security Counsel*
Thomas Rachko, *Associate*
John Raphling, *Senior Researcher*
Brian Root, *Quantitative Analyst*
Sarah St Vincent, *Researcher*
Jasmine L Tyler, *Advocacy Director*

**HUMAN RIGHTS WATCH**

Kenneth Roth, *Executive Director*
Michele Alexander, *Deputy Executive Director, Development and Global Initiatives*
Iain Levine, *Deputy Executive Director, Program*
Chuck Lustig, *Deputy Executive Director, Operations*
Bruno Stagno Ugarte, *Deputy Executive Director, Advocacy*

Emma Daly, *Communications Director*
Peggy Hicks, *Global Advocacy Director*
Babatunde Olugboji, *Deputy Program Director*
Dinah PoKempner, *General Counsel*
Tom Porteous, *Deputy Program Director*
James Ross, *Legal & Policy Director*
Joe Saunders, *Deputy Program Director*
Frances Sinha, *Human Resources Director*

**BOARD OF DIRECTORS**

Hassan Elmasry, *Co-Chair*
Joel Motley, *Co-Chair*
Wendy Keys, *Vice Chair*
Susan Manilow, *Vice Chair*
Jean-Louis Servan-Schreiber, *Vice Chair*
Sid Shenberg, *Vice Chair*
John J Studzinski, *Vice Chair*
Michael G. Fisch, *Treasurer*
Bruce Rabb, *Secretary*
Karen Ackman
Jorge Castañeda
Tony Elliott
Michael E Gellert
Hina Jilani
Betsy Karel
Robert Kissane
David Lakhdhir
Kimberly Marteau Emerson
Oki Matsumoto
Barry Meyer
Joan R Platt
Amy Rao
Neil Rimer
Victoria Riskin
Graham Robeson
Shelley Rubin
Kevin P Ryan
Ambassador Robin Sanders
Javier Solana
Sim Stolt-Nielsen
Darian W Swig
Makoto Takano
John R Taylor
Amy Towers
Peter Visser
Marie Warburg
Catherine Zennstrom

Matt Dummermuth
Principal Deputy Assistant Attorney General
US Department of Justice
810 Seventh St. NW
Washington, DC 20531

Cc: Caren Harp
Administrator, Office of Juvenile Justice and Delinquency Prevention
US Department of Justice

Michael Horowitz
Inspector General
US Department of Justice

Peter Winn
Acting Chief Privacy and Civil Liberties Officer
US Department of Justice

Re: Child Protection System software suite

February 1, 2019

Dear Mr. Dummermuth:

We write to ask questions and express concerns about Child Protection System (CPS), a software suite that federal and state law enforcement—including members of the Internet Crimes Against Children Task Force Program established by the Justice Department—use to investigate crimes related to the sharing of child sexual exploitation images.

Human Rights Watch has long promoted accountability for sexual abuse of children around the world, and recognizes that lawful and rights-protecting efforts to prosecute and punish those who commit such crimes are of utmost importance.[1] Our examination of CPS, however, raises several concerns that tie into broader problems in the US criminal justice system.

Specifically, we are concerned that:

---

[1] Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and pornography, UN Doc. A/RES/54/263 (March 16, 2001), art. 3(1)(c), https://www.ohchr.org/en/professionalinterest/pages/opsccrc.aspx (accessed October 29, 2018). Human Rights Watch has produced a substantial body of work investigating and advocating effective measures to curb sexual abuse of children. Some examples include Human Rights Watch, *Breaking the Silence: Child Sexual Abuse in India* (2013), https://www.hrw.org/report/2013/02/07/breaking-silence/child-sexual-abuse-india; Human Rights Watch, "End Child Marriage," https://www.hrw.org/EndChildMarriage; and Saroop Ijaz, "Protect Pakistan's Children from Sexual Abuse," commentary, Human Rights Dispatch, August 14, 2018, https://www.hrw.org/news/2018/08/14/protect-pakistans-children-sexual-abuse.

**H U M A N**
**R I G H T S**
**W A T C H**

**HRW.org**

- As has proven to be the case regarding other technical investigative methods US authorities have previously employed,[2] the CPS software may not have been subject to thorough independent testing of its accuracy and functioning. Since the system is designed to flag people as suspected of having committed crimes, both its error rates and its potential to exceed constitutional bounds have implications for rights. It is unclear what information the Justice Department has about CPS' potential for error (and on what basis), although prosecutors stated in one court filing that CPS mistakes are "practically nonexistent."[3]

- CPS is provided by a non-profit organization that has repeatedly stated it offers the system exclusively to law enforcement, while prosecutors have argued that they cannot provide the software to criminal defense experts for testing because it is proprietary and not in the government's possession. We fear that the government may be shielding its methods from scrutiny by relying on its arrangements with the non-profit—one whose close relationship with police may, in fact, make it a government agent.

- The CPS software may be facilitating undisclosed police access, without legal process, to personal data about internet subscribers held by a datamining program that private credit reporting agency TransUnion owns. There appears to be a close relationship between the non-profit organization that offers CPS and this private credit reporting agency. If this is indeed occurring, such a practice would give rise to constitutional, federal, and human rights law and policy concerns.

- Among the potential issues arising from any such secret law enforcement access to personal data is that defendants and trial courts may not learn about, or be able to challenge, the breadth of information police obtain—and the potential for that information to facilitate decision-making based on implicit bias or other improper factors.

- Law enforcement may be concealing any such secret use of personal data by deliberately creating a new and different paper trail—a practice known as "parallel construction," which our prior reporting suggests is a common and rights-harming problem in US prosecutions.[4]

- Potential errors by officers in identifying files as illicit—and registering them as such in a shared database—may harm legitimate free expression in a lasting manner. It is unclear whether any systematic review occurs to prevent this from happening.

- The available sources do not indicate what efforts the Justice Department or other law enforcement agencies make to ensure that any data incorrectly linking innocent people to the highly stigmatized offense of possessing child sexual abuse images is corrected or deleted.

This letter provides background and details regarding these concerns and seeks information from the Justice Department on or before February 18, 2019 about current policies and practices related to law enforcement uses of CPS.

---

[2] Recent examples include hair comparisons and bite-mark analysis. See, for example, President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring the Scientific Validity of Feature-Comparison Methods* (2016), pp. 8-9, 13-14, 83-87, 118-122, https://www.innocenceproject.org/wp-content/uploads/2017/03/PCAST-2017-update.pdf (accessed October 30, 2018) (hereinafter "PCAST Report").

[3] *Infra* n. 22 and accompanying text.

[4] Human Rights Watch, *Dark Side: Secret Origins of Evidence in US Criminal Cases*, January 2018, https://www.hrw.org/sites/default/files/report_pdf/us0118.pdf.

HUMAN
RIGHTS
WATCH

HRW.org

The discussion below is based on research we conducted between May 2016 and October 2018, including an examination of records from 20 federal prosecutions in which the government explicitly disclosed the use of CPS, as well as information appearing in a set of federal civil-rights lawsuits brought against local authorities in Mississippi in 2011 following the use of CPS there. (See Appendix for a list of these cases.) Although we do not address state cases here, media coverage and other sources suggest that prosecutions in state courts involving CPS use may be common.[5]

### The CPS Software Suite

CPS is a set of software tools and databases designed to help law enforcement identify individuals who allegedly share child exploitation images on peer-to-peer networks, which enable internet users to connect to one another and trade files such as pictures, music, and videos. A US-based non-profit organization, Child Rescue Coalition (CRC), reports that it provides the software suite to law enforcement—including the Internet Crimes Against Children Task Force run by the Justice Department.[6]

It is our understanding that a CPS component called Peer Spectre monitors file-sharing traffic on peer-to-peer networks. Anyone on a peer-to-peer network can search for files by keyword, and we understand that Peer Spectre carries out continuous, automated keyword searching for suspicious file titles and identifies Internet Protocol (IP) addresses that are allegedly sharing those files. The results of these searches are logged in servers law enforcement can access.

We understand that a second component of CPS, Shareaza LE, then enables law enforcement to single out a particular IP address and attempts to download all the files it is sharing, a technique known as a "sole source download." This gives police a means of investigating the tips CPS generates when it monitors the peer-to-peer network. Our information suggests that without Shareaza LE (which is not available to the public), peer-to-peer network users typically cannot carry out sole source downloads.

We understand that at these initial stages, suspected child exploitation images are identified using "hash values," or unique digital identifiers roughly analogous to fingerprints, that can be calculated for many files using certain algorithms.

What is now CPS was apparently developed as part of a collaborative effort by law enforcement authorities and then was acquired by a data broker known as TLO, LLC, in

---

[5] See, for example, Carey Codd, "Boca Raton-Based Child Rescue Coalition Works 'To Find Those That Victimize Kids," *CBS4 News*, November 18, 2015, https://miami.cbslocal.com/2015/11/18/boca-raton-based-child-rescue-coalition-works-to-find-those-that-victimize-kids/ (accessed December 12, 2018) ("The Broward State Attorney's Office said they've prosecuted close to 150 cases based on information supplied by the Child Rescue Coalition"); *People v. Worrell*, 59 Misc. 3d 594 (N.Y.), March 2, 2018; *State v. Baric*, 2018 WI App. 63 (Wis. Ct. App.), September 18, 2018; *Frazier v. State*, 180 So. 3d 1067 (Fla. Dist. Ct. App.), November 20, 2015.

[6] *United States v. McKinion*, no. 2:14-cr-00124 (C.D. Cal..), Declaration of William S. Wiltse (doc. 62-1), para. 2; Child Rescue Coalition Inc., Internal Revenue Service Form 990 (2017), p. 36; Department of Justice, "Office of Juvenile Justice and Delinquency Prevention's Internet Crimes Against Children Task Forces Arrest More Than 1,000 Child Predators in Operation Broken Heart," Press release, June 22, 2015, https://www.justice.gov/opa/pr/office-juvenile-justice-and-delinquency-prevention-s-internet-crimes-against-children-task (accessed October 30, 2018), Internet Crimes Against Children Task Force Program, https://www.icactaskforce.org/ (accessed October 30, 2018).



**HRW.org**

2009.[7] TLO was purchased by credit reporting agency TransUnion in 2013 after filing for bankruptcy and is now known as TLOxp.[8] CRC, the non-profit organization that now offers CPS, was established in the wake of TLO's bankruptcy and continues to share a physical address with TLOxp.[9]

### Reliability Testing Concerns: Accuracy and Reach

#### 1.  Accuracy

Concern has grown in recent years about how US courts regard technical investigative methods and whether those methods have been adequately tested to ensure their accuracy and consistency.[10] Without rigorous testing, it is impossible to know objectively how often an investigative method produces false positives or false negatives, and what factors may affect those rates.[11]

However, to date we have not found any public information on CPS having been tested by qualified independent experts or results of such testing.

Knowing the accuracy of investigative methods is important for human rights and constitutional reasons. Except in an emergency or other exceptional circumstance, US police may force people to submit to intrusive searches of their homes or electronic devices only if the authorities first obtain a warrant from a court based on a demonstration that they have probable cause to believe they will find evidence of a crime. To show that such probable cause exists, they may rely wholly or partly on results from an investigative tool such as CPS. If the tool has accuracy problems, its results may not provide a sufficiently sound basis for a court to include in the justification for issuing a warrant—and a warrant issued without probable cause is unconstitutional under the Fourth Amendment. In turn, under the "fruit of the poisonous tree" rule, trial courts will normally prohibit prosecutors from introducing any evidence that derives from an initial illegal search, such as one based on a warrant that lacked probable cause.[12]

---

[7] See, for example, *United States v. Dang*, no. 6:16-cr-10027 (D. Kan.), Affidavit of William S. Wiltse (doc. 23-1), undated, filed September 26, 2016, para. 2; *United States v. Clements*, no. 1:15-cr-00275 (N.D. Ohio), Affidavit of William S. Wiltse (doc. 18-1), August 2, 2013, para  2.

[8] Jeff Ostrowski, "After founder's death, Boca tech firm TLO files for Chapter 11," *Palm Beach Post*, May 9, 2013, https://www.mypalmbeachpost.com/business/after-founder-death-boca-tech-firm-tlo-files-for-chapter/34CcC2Hza646WkCtWoWZuN/ (accessed October 30, 2018); TransUnion, "TransUnion Completes Acquisition of TLO," https://newsroom.transunion.com/transunion-completes-acquisition-of-tlo/ (accessed October 30, 2018); TransUnion and TLOxp, www.tloxp.com (accessed October 30, 2018).

[9] CRC's Form 990 tax filing for 2013 covers a period beginning December 11, 2013, suggesting that the organization was established on or around this date. Its address is listed on its 2017 Form 990; the same address is listed on TLOxp's "Contact Us" page, https://www.tlo.com/contact (accessed October 31, 2018).

[10] See, PCAST Report, *supra* n. 2, pp. 3-6; Rebecca Wexler, "Convicted by Code," *Slate*, October 6, 2015, https://slate.com/technology/2015/10/defendants-should-be-able-to-inspect-software-code-used-in-forensics html (accessed October 31, 2018); Jonathan Jones, "Forensic Tools: What's Reliable and What's Not-So-Scientific," Frontline, April 17, 2012, https://www.pbs.org/wgbh/frontline/article/forensic-tools-whats-reliable-and-whats-not-so-scientific/ (accessed October 30, 2018); Innocence Project, "Misapplication of Forensic Science," undated, https://www.innocenceproject.org/causes/misapplication-forensic-science/ (accessed October 30, 2018).

[11] See generally PCAST Report, *supra* n. 2, pp. 5-6.

[12] *Wong Sun v. United States*, 371 U.S  471 (1963).

This means establishing a technique's error rates is critical both to protecting people from unconstitutional searches and to ensuring that in a criminal trial, the prosecution cannot unfairly benefit from illegal police activities.

**HUMAN RIGHTS WATCH**

**HRW.org**

Where software is concerned, the Justice Department's policy guidance states that such tools "used to support evidence discovery, extraction and examination, case examination and evaluation and method development shall be technically reviewed by qualified experts and validated prior to use."[13] Materials the US Commerce Department's National Institute of Standards and Technology (NIST) has published help demonstrate that it is possible to develop a methodology for objectively testing how, and how reliably, software operates. For example, as part of a project concerning computer forensic tools, NIST has set out a testing process that includes, inter alia:

- The development of test cases, which are then posted online, along with other information, for "peer review by members of the computer forensics community and for public comment by other interested parties";
- The incorporation of feedback from the peer-review and public-comment processes;
- NIST's acquisition of the tool for testing;
- An examination of the available documentation;
- The selection of appropriate test cases;
- The development of a test strategy;
- The execution of the test; and
- The production and online posting of a test report.[14]

As noted above, despite the existence of such scientific methodologies and the Justice Department's policy, we have been unable to locate any evidence that CPS has been subjected to complete, independent, peer-reviewed testing. If such tests have been carried out, we request that you make the studies publicly available.[15]

When defendants have made motions seeking to arrange for expert testing of the software, federal prosecutors have sometimes sought to avoid producing CPS' source code for testing on the grounds that it is protected from disclosure by law enforcement privilege,[16] that the code is proprietary and not in the government's possession[17]—or both.[18] We have identified only one case—*United States v. Ocasio*—in which prosecutors ultimately produced the CPS

---

[13] U.S. Department of Justice, "Scientific Research and Integrity Policy," undated, https://www.justice.gov/olp/forensic-science (accessed December 6, 2018), p 6.

[14] National Institute of Standards and Technology, "Methodology Overview," February 22, 2018, https://www.nist.gov/itl/ssd/software-quality-group/computer-forensics-tool-testing-program-cftt/cftt-general-0 (accessed October 30, 2018).

[15] CRC's president William Wiltse testified during a 2013 hearing concerning a defense motion to suppress in *United States v Thomas*, a Vermont federal case, that some aspects of the CPS suite were tested internally to a certain degree when CPS was first developed, but that the suite had not been tested more recently or subjected to thorough, independent testing using a standardized process. *United States v. Thomas*, no. 5:12-cr-00037 (D. Vt.), "Transcript: Motion to Suppress & Request for a *Franks* Hearing," (doc. 99), April 17, 2013, pp. 102-110.

[16] See, for example, *United States v. Dang*, *supra* n. 7, Response to Defendant's Motion to Compel Production (doc. 23), September 26, 2016, p. 12; *United States v. Hartman*, no. 8:15-cr-00063 (C.D Cal.), Opposition to Defendant's Motion to Compel Discovery (doc. 37), September 24, 2015, p. 4.

[17] See, for example, *United States v. Neale*, no 5:12-cr-00044 (D. Vt ), Response to Defendant's Motion to Compel Discovery (doc. 44), December 7, 2012, pp. 8-10; *United States v. Crowe*, no. 1:11-cr-01690 (D N.M.), Response to Defendant's Motion to Compel and Motion to Inspect (doc. 58), June 1, 2012, pp. 11-15.

[18] *Ibid.*; *United States v. Dang*, *supra* n 7, Response to Defendant's Motion to Compel Production (doc 23), September 26, 2016, pp. 12, 23-24.



HRW.org

source code to a defendant, and a statement submitted in a later case suggests that *Ocasio* was resolved through a plea agreement before any expert testing took place.[19]

By contrast, in a 2015 decision in *United States v. Naylor*, a West Virginia federal court simply accepted an officer's assertion that in his personal experience, the tool had never erred and was (in the court's words) "100% reliable."[20] The court therefore concluded that "[t]he CPS software appears to be a reliable investigative tool for law enforcement in these types of cases" and rejected the defendant's motion to suppress evidence found through the software.[21] In at least one case, the government itself has asserted in a motion that "[e]rror is practically nonexistent in the Shareaza LE and CPS systems" without citing any sources for this claim.[22]

We fear this situation—in which prosecutors resist defense testing of CPS but are willing to make, or apparently allow witnesses to make, assertions about the software's accuracy—may interfere with the judiciary's ability to assess the tool's potential for malfunction, and thus jeopardize fair-trial rights.

Regarding assertions that CPS' source code is proprietary or otherwise not in the government's possession, we note that CRC has consistently described itself as heavily enmeshed with and dedicated to furthering the operations of law enforcement. In its tax filings, the organization has stated that it "offers space at its operational location to law enforcement agencies in order to easily access the tracking system."[23] Affidavits by the group's president, William Wiltse, have described access to CPS as "made available to specifically trained and licensed law enforcement officers and ... *restricted to only those law enforcement officers in the performance of law enforcement activity*" (emphasis added).[24] Testimony by Wiltse in 2013 concerning CPS-enabled investigations (prior to the establishment of CRC) described a "restricted area" on TLO's property: "The only people allowed into this area are sworn law enforcement officers. Even our boss, our CEO, cannot get into this area without being escorted," Wiltse told the court.[25] Wiltse himself is a reserve deputy sheriff for Florida's Palm Beach County, according to his affidavits and CRC's website.[26]

[19] For the decision granting the defendant's motion to compel production of the CPS source code in *United States v. Ocasio*, no. 3:11-cr-02728 (W.D. Tex.), see 2013 U.S. Dist. Lexis 79313 (2013 WL 2458617), June 6, 2013. For a discussion concerning how *Ocasio* was resolved, see *United States v. Shia*, no. 3:15-cr-00257 (N.D. Cal.), Affidavit of Tami Loehrs Re Ocasio Case (doc  27), November 19, 2015

[20] *United States v. Naylor*, 99 F. Supp. 3d 638, 643 (S.D.W Va., 2015).

[21] *Ibid.*

[22] *United States v. Pirosko*, no. 5:12-cr-00327 (N.D. Ohio), Response in Opposition to Defendant's Motion to Compel (doc. 32), August 2, 2013, pp. 7-8. To the best of our knowledge, the case the government mentioned in the second part of the sentence involved a different software program.

[23] See, for example, Form 990 (2017), *supra* n. 9, p. 36.

[24] *United States v. Dunning*, no. 7:15-cr-00004 (E.D. Ky.), August 26, 2015, Affidavit of William S. Wiltse (doc. 30-1), September 14, 2015, para. 13; *United States v. Crowe*, *supra* n. 17, Affidavit of William S. Wiltse (doc. 58-1), June 1, 2012, para. 3; *United States v. Clements*, *supra* n. 7, Affidavit of William S. Wiltse (doc. 18-1), August 2, 2013, para. 3.

[25] *United States v. Thomas*, *supra* n  15, Transcript, pp. 131-32

[26] *United States v. Dunning*, *supra* n. 24, Affidavit of William S. Wiltse, para. 1; Child Rescue Coalition, "Our Team," https://childrescuecoalition.org/our-team/ (accessed October 31, 2018).



We therefore regard government arguments that prosecutors cannot produce the CPS source code for testing as both inappropriate and jeopardizing fair-trial rights, insofar as access to the source code is necessary for scientifically sound testing.[27]

### 2. Reach

Accuracy is not the only aspect of CPS that is susceptible to testing and should be subject to scientifically sound validation prior to law enforcement use. The software suite's reach also has potential constitutional consequences.

Federal courts have found that police do not need a search warrant to monitor peer-to-peer network activities that take place in public,[28] and CRC's president has maintained that the CPS software only locates information that peer-to-peer network users have publicly shared. [29] If this description of CPS is correct, then under current US constitutional law, police may use or rely on the software without obtaining a warrant first.

However, defendants in several federal cases have offered evidence that files (or traces of files) officers have identified using CPS may have been stored in areas of their devices that were not publicly shared, raising Fourth Amendment concerns.[30] We acknowledge that the strength of this evidence is open to debate and that federal prosecutors have challenged the credibility of the forensic expert who produced the relevant reports. However, nowhere in the records we reviewed does the government actually set out evidence refuting the claims that CPS can reach beyond publicly shared folders, let alone persuasively show that the software cannot do so or is not being so used.[31]

This, too, is a matter that rigorous independent testing can and should resolve.

### Free Speech and Related Concerns

To function accurately, CPS depends not only on the correct identification of IP addresses and the hash values of shared files, but on police officers correctly designating files as containing illegal child exploitation images. The potential for mistakes in this respect prompts concerns about the resulting impact on legitimate free expression, particularly if the Justice Department does not ensure that these designations are regularly reviewed.

---

[27] See, also, Rebecca Wexler, "Life, Liberty, and Trade Secrets: Intellectual Property in the Criminal Justice System," *Stanford Law Review*, vol. 70 (May 2018), pp. 1364-65, 1429, https://review.law.stanford.edu/wp-content/uploads/sites/3/2018/06/70-Stan.-L.-Rev.-1343.pdf (accessed October 31, 2018) (specifically addressing the CPS case *Ocasio* and concluding that "extending the [trade secret] privilege wholesale from civil to criminal proceedings is both harmful and unnecessary").

[28] See, for example, *United States v. Thomas*, 2013 WL 6000484 (D. Vt. 2013), 47-51 (aff'd 2d Cir., 788 F. 3d 345, 351 (2015); *United States v. Baalerud*, 2015 WL 1349821 (W.D.N.C. 2015), pp. 23-26; *United States v. Dodson*, 960 F. Supp. 2d p. 689, pp. 695-696 (W.D. Tex. 2013).

[29] See, for example, *United States v. Clements*, *supra* n. 7, Affidavit of William S. Wiltse (doc. 18-1), August 2, 2013, para. 8; *United States v. Crowe*, *supra* n. 25, Affidavit of William S. Wiltse (doc. 58-1), May 31, 2012, para. 6.

[30] *United States v. Clements*, *supra* n. 7, Affidavit of Tami Loehrs (doc. 17-2), November 19, 2015, para 10; *United States v. Crowe*, *supra* n. 25, Affidavit of Tami Loehrs (doc. 48-1), April 26, 2012, paras. 11, 14-16; *United States v. Dang*, *supra* n. 7, Affidavit of Tami Loehrs (doc. 19-1), August 9, 2016, para. 11; *United States v. Hartman*, *supra* n. 24, Affidavit of Tami Loehrs (doc. 50-1), October 8, 2015, paras. 14-16.

[31] See, for example, *United States v. Hartman*, *supra* n. 16, Order Re Pretrial Motions (doc. 87), November 24, 2015, pp. 22-23 (noting that "the Government has not refuted the defense expert's analysis that suggests the files at issue here were not designated as shareable," although it had had "ample opportunity to do so").

HUMAN
RIGHTS
WATCH

HRW.org

An affidavit by Wiltse in an Ohio federal prosecution, *United States v. Clements*, and his 2013 testimony in *Thomas* indicate that officers using CPS may designate newly discovered files as "Child Notable" based on their own opinions and proceed to register hash values for those files in one or more of the system's networked databases.[32] Wiltse's testimony in *Thomas* further indicates that CPS' reliance on these officer-made designations is extensive.[33] However, the records we have examined do not disclose any systematic safeguards for ensuring that these designations are accurate. This raises concerns that people's right to access and receive information—part of the right to free expression—could be at risk if officers mischaracterize files, or generate records when someone possesses lawful files (such as legal adult pornography).

Additionally, we understand that the element of the software suite called Shareaza LE gives officers the technical ability to view the hash values of, and download, *any* file an IP address is sharing on a peer-to-peer network—regardless of whether those files are believed to be illicit.[34] The Justice Department should explain whether it takes steps to ensure officers are not monitoring legitimate free expression in a manner that would be inconsistent with rights laws or policies.

## Personal Data and Discrimination Concerns

Through our research, we have become aware of potential law enforcement access to personal information when using CPS. This potential for access could undermine privacy and consumer protections found in federal law, reduce defendants' ability to learn about and challenge any abusive practices, and facilitate improper decision-making.

An undated user agreement for the CPS software submitted as evidence in a 2015 California criminal prosecution, *United States v. Hartman*, suggests that CPS users have—or have had—free access to "Unconfirmed Subscriber Data provided by TLO."[35] "Subscriber" is apparently a reference to people who subscribe to internet services and therefore are associated with an IP address, while "TLO" is a reference to the datamining operation now known as TLOxp.

---

[32] *United States v. Clements, supra* n. 7, Affidavit of William S. Wiltse, para. 9 ("The term 'Child Notable' is an *investigator assigned* category for certain file hashes within the Child Protection System ... During training investigators are provided software, which generates hash values for recently located child exploitation files and submits those hash values to CPS databases *with a category selected by the investigator*" (emphasis added)); *United States v. Thomas, supra* n. 23, Transcript, pp. 56-57 ("[L]aw enforcement has been aware and continues to become aware of new pieces of child pornography that are being made available on these [peer-to-peer] file sharing networks.... What law enforcement is trained to do is submit the hash values, so we actually give them tools that calculate the hash value for these files, but then law enforcement can then electronically submit those hash values to us, along with a category that the officer is trained to use as far as what is it that this file is categorized as based on your training, and then we then can leverage that hash value or the knowledge of that hash value in programs such as Peer Spectre. So what I mean by that is Peer Spectre is aware of hundreds of thousands of pieces of what *investigators describe as* child notable, which I guess for all intents and purposes is child pornography" (emphasis added)).”

[33] *United States v. Thomas, supra* n. 23, Transcript, pp. 56-57 ("Peer Spectre is aware of *hundreds of thousands* of pieces of what investigators describe as child notable [files]" (emphasis added)).

[34] See, for example, *United States v. Clements, supra* n. 7, doc. 22-6 (filed March 16, 2016); *United States v. Naylor, supra* n. 24, no. 2:14-cr-00194 (S.D.W. Va.), doc. 19-1 (filed January 6, 2015), p. 17 of file. These documents are CPS screenshots indicating that officers using the software suite can see that an individual is sharing files that are "Not Categorized," "Adult Erotic," or of "No Known Relevance," in addition to known or suspected "Child Notable" files.

[35] *United States v Hartman, supra* n. 16, "The Child Protection System – Acceptable Use Requirements" (doc. 102-2), undated, filed January 8, 2016, p. 2.

HUMAN
RIGHTS
WATCH

HRW.org

This "Unconfirmed Subscriber Data" might include marketing data about individuals—such as names, telephone numbers, addresses, and dates of birth—that corporate sources have linked to their IP addresses and email accounts. It is our understanding that officers using CPS have been told that no logs will be kept of any search they may perform of this corporate data.

Can you confirm what "Unconfirmed Subscriber Data" includes, from whence it is derived, and the means by which TLOxp could identify IP addresses with specific individuals? We would also like to understand why no records would be kept of law enforcement queries of this data, and whether that is, in fact, the practice.

TLOxp's website indicates that the information the datamining system possesses about an individual may include addresses and phone numbers;[36] records from automated license plate readers,[37] which can reveal where a car has traveled; information from drivers' licenses;[38] Social Security numbers;[39] employment records;[40] social media profiles, including photographs;[41] criminal records;[42] and connections to other people.[43] Please provide your understanding of what types of data CPS users, via TLOxp, may be able to view.

Under the Electronic Communications Privacy Act (ECPA), electronic communications service providers normally may only disclose information identifying the subscriber linked to an IP address in response to a subpoena or other legal process—thus leaving a paper trail defendants can obtain and scrutinize.[44] ECPA also limits the types of subscriber information the provider is obligated to disclose when responding to such a subpoena: primarily name, address, dates and durations of online sessions, and payment information.[45] While ECPA is outdated in many respects and subpoena powers are themselves susceptible to misuse,[46] these provisions nevertheless impose a significant privacy protection and create transparency about both the law enforcement demand and the data disclosed in response to it.

Our understanding is that TLOxp and CRC are not communications service providers and that ECPA therefore does not technically apply to their disclosure of data concerning people linked to IP addresses. However, we are concerned that the use of data from a data broker to identify subscribers without a subpoena or other legal process would subvert the protections Congress intended to establish in the law. Can you provide the details of what types of personal data law enforcement may be able to obtain when using CPS—and whether

---

[36] TransUnion, "TLOxp for Law Enforcement," https://www.tlo.com/law-enforcement (accessed November 5, 2018).

[37] TransUnion, "TLOxp Vehicle Sightings," https://www.tlo.com/vehicle-sightings (accessed November 5, 2018).

[38] TransUnion, "TransUnion's TLOxp for Law Enforcement," 2017, https://www.tlo.com/resources/tlo/doc/industry/resources/industry-law-enforcement-as pdf (accessed December 17, 2018), p. 2.

[39] "TLO for Law Enforcement," *supra* n. 36

[40] *Ibid.*

[41] TransUnion, "TLOxp Social Media Search," https://www.tlo.com/social-media (accessed November 5, 2018); "About TLOxp," *supra* n. 3.

[42] TransUnion, "TransUnion's TLOxp for Law Enforcement," *supra* n. 38, p. 1

[43] TransUnion, "TLOxp Relationship Report," https://www.tlo.com/relationship (accessed November 5, 2018).

[44] 18 U.S.C. §§ 2702-03.

[45] 18 U.S.C. § 2703(c).

[46] See Human Rights Watch, *Dark Side*, *supra* n. 4, pp. 28-29.

HUMAN
RIGHTS
WATCH

HRW.org

that data may go beyond what a communications service provider would normally disclose under ECPA?

As noted above, TLOxp's technical means of linking individuals to IP addresses also remain unclear. These methods could raise further constitutional or other legal questions when the data is used by law enforcement, rendering the disclosure of information about them desirable to ensure respect for rights. We would appreciate any information you may have as to these technical means, and whether and to what sort of technical or legal review they may have been subjected.

Our understanding of the typical progression of a CPS-enabled investigation is that the software's broad monitoring of peer-to-peer networks results in a database of IP addresses that are suspected of offering illicit files, and that officers can then use a different component of CPS in an attempt to create a complete log of all the files a specific IP address is sharing. At this stage, under ECPA, officers would have the power to issue a subpoena directly to the internet service provider and thereby obtain the name and address of the relevant internet subscriber. Our review of relevant cases suggests that such subpoenas are typically disclosed to defendants, who are then able to review these records. Can you explain why officers may choose to not use the ECPA, which provides a record to courts and defendants, to obtain a defendant's name and address, opting instead to use TLOxp for this purpose?

We further note that CRC's website claims the non-profit offers "[a]nalytics targeting the offenders at greatest risk of presently abusing children."[47] The Justice Department should disclose whether police are receiving the results of such "[a]nalytics," and if so, what data the non-profit uses—or enables officers to use—when making these calculations.

### Fundamental Rights Concerns: Parallel Construction

While "Unconfirmed Subscriber Data" from what is now TLOxp appears to be (or have been) available to CPS users, only one case we examined includes a record openly referring to this practice. It is possible that this absence of disclosures is due to officers' decisions not to view or use this data even though CRC has offered it. However, we are concerned that law enforcement may be gaining access to this personal data from or through CRC, and then deliberately concealing how officers obtained the information by re-obtaining it in other ways for use in court—a practice known as parallel construction. In our 2018 report *Dark Side: Secret Origins of Evidence in US Criminal Cases*, we documented evidence suggesting law enforcement has at times used parallel construction to conceal the original sources of leads in some criminal cases.[48]

Parallel construction can prevent courts from reaching important or novel questions about constitutional rights, and defendants from arguing that judges should exclude unconstitutionally obtained evidence under the "fruit of the poisonous tree" rule. The

---

[47] Child Rescue Coalition, "The Solution," https://childrescuecoalition.org/the-solution/ (accessed December 20, 2018).
[48] Human Rights Watch, *Dark Side, supra* n. 4, p. 1.

**H U M A N**
**R I G H T S**
**W A T C H**

**HRW.org**

practice can also prevent defendants from learning that the government obtained exculpatory evidence during its investigation.[49]

As noted above, if police were attempting to obtain the identity of a subscriber associated with an IP address from an internet or telephone service provider, they would need to issue a subpoena.[50] However, the CPS user agreement disclosed in 2016 instructs, "Do not use this [data from TLO] for probable cause. It must be confirmed through other investigative means that are acceptable with your agency and prosecuting attorney."[51] This reference to using "other investigative means" to "confirm[]" personal data previously obtained by another method prompts concerns that officers may employ parallel construction to avoid revealing that their initial leads came from personal data obtained from TLOxp. Can you comment on whether this has been a practice, or whether there are measures to prevent such practices in place?

The potential use of subpoenas as a means of "parallel construction" in a different context is currently the subject of an investigation by the Justice Department's Office of the Inspector General.[52] We encourage the Inspector General, to whom we will send a copy of this letter, to expand its investigation to determine whether such use of subpoenas is occurring in this context as well, and hope you will support such an effort.

In a California federal prosecution, *United States v. McKinion*, a Homeland Security Investigations special agent in Los Angeles used CPS to identify two different IP addresses as allegedly possessing unlawful child sexual abuse images in May 2012.[53] The agent's search warrant application stated that "throughout ... April 2012," the agent had "conducted records checks" for McKinion, including searches of address records and employment history.[54] The agent issued either a single subpoena or two subpoenas on the same date to the relevant internet service provider regarding the two IP addresses in May 2012.[55]

In his affidavit, the agent did not explain what databases he used for his "records checks," why he had conducted such checks concerning McKinion in April 2012 if the suspected illicit activities were only detected beginning in May 2012, or whether or how he linked both IP addresses to McKinion prior to issuing the subpoena(s)—especially when one of the IP addresses was shared with seven other people.[56] Likewise, prosecutors did not explain precisely how the two different IP addresses had been linked to the defendant, instead stating simply that the special agent "determined that Suspect IP 1 belonged to defendant and that defendant used Suspect IP 2."[57]

---

[49] *Ibid.* at pp. 3, 57, 59.

[50] 18 U.S.C. § 2703(c)(2).

[51] *United States v. Hartman*, doc. 102-2, *supra* n. 16, p. 2

[52] Office of the Inspector General, U.S. Department of Justice, "Ongoing Work," https://oig.justice.gov/ongoing/all htm (accessed November 5, 2018).

[53] *United States v. McKinion*, *supra* n. 6, Affidavit in Support of Search Warrant (doc. 49-2), July 23, 2012, paras. 30-32. **Please be aware that these paragraphs contain graphic and disturbing descriptions of child sexual abuse images.**

[54] *Ibid.* at paras. 35-38.

[55] *Ibid.* at paras. 33-34.

[56] *Ibid.* at para. 34; see also *United States v. McKinion*, *supra* n. 6, Motion to Suppress Evidence Derived from Search Warrant (doc. 47), May 15, 2017, pp. 15-16.

[57] *United States v. McKinion*, *supra* n. 6, Opposition to Defendant's Motion to Suppress Evidence (doc 49), May 22, 2017, p. 6. The structure of the discussion in this paragraph implies without stating that the special agent made this determination before issuing a subpoena to internet service provider Catalina Computers.



We are concerned that parallel construction may have been employed in this case to avoid the disclosure of investigative activities prior to April 2012 and/or the use of databases that may have linked the IP addresses to individuals' names, and invite the Justice Department to comment on this.

## Correcting Mistakes
Human Rights Watch is also concerned about whether CRC or law enforcement delete or correct data incorrectly linking innocent people to the possession of child sexual exploitation materials and, if so, how this is done.

Ensuring the deletion or correction of inaccurate data is essential to respecting rights and dignity. This is especially true when individuals may be wrongly suspected of illicit file-sharing because someone else used their internet services or devices for illegal activities without their knowledge. Police investigations of alleged downloads of child abuse images involving shared wi-fi networks and computers have previously led to questioning and searches impacting innocent people.[58] One such investigation in Jackson, Mississippi in 2011 that involved CPS led to a civil-rights lawsuit against local police.[59]

Wiltse, CRC's president, also acknowledged in a 2017 declaration in *McKinion* that if a malicious hacker gained access to the nonprofit's tools, he or she could "implicate an innocent person's IP address as participating in the collection, manufacture or distribution of child exploitation files."[60] Such a possibility, no matter how seemingly remote, further supports the need for safeguards at all stages in the collection, storage, and sharing of personal data related to such law enforcement activities.

## Questions for the Justice Department
In light of the foregoing discussion of concerns, we request that the Justice Department provide answers to the following questions:

## Testing

- Has the Justice Department conducted or commissioned thorough independent third-party testing of CPS? If so, what methodology was used and what were the results? If not, does the use of CPS comply with the Department's policy regarding the validation of software tools?

---

[58] See, for example, *Tuskan v. Jackson County, infra* n. 59; Sam Stanton, "He wanted to download child porn, so he hacked his neighbor's wifi," *Sacramento Bee*, August 1, 2017, https://www.sacbee.com/news/local/crime/article164803532.html (accessed December 7, 2018); Anthony Bellano, "Man Was Pirating Neighbor's Wi-Fi To Download Child Pornography: Prosecutor," *Patch*, September 12, 2016, https://patch.com/new-jersey/gloucestertownship/clementon-man-was-pirating-neighbors-wi-fi-download-child-pornography (accessed December 7, 2018); Brett Cihon, "Prosecutor: Man sets up neighbor's Wi-Fi, secretly uses it to download child porn," *Q13 FOX*, April 9, 2014, https://q13fox.com/2014/04/09/prosecutor-man-sets-up-neighbors-wi-fi-secretly-uses-it-to-download-child-porn/ (accessed December 7, 2018); Debra Cassens Weiss, "Prosecutor's Apology for Home Raid Highlights the Dangers of Unprotected WiFi," *ABA Journal*, March 18, 2011, http://www.abajournal.com/news/article/prosecutors_apology_for_home_raid_highlights_the_dangers_of_unprotected_wif/ (accessed December 7, 2018).

[59] *Tuskan v. Jackson County*, 2016 U.S. Dist. Lexis 182700 (S.D. Miss., 2016); for an investigative document showing the use of CPS, see case document 60-9 (case no. 1:13-cv-00356).

[60] *United States v. McKinion, supra* n. 6, Declaration of William S Wiltse (doc. 62-1), October 27, 2017, paras. 15-16.



HRW.org

- Does the Justice Department have policies or practices that relate to the involvement of private or nongovernmental entities in conducting or facilitating law enforcement operations, and if so, what are they?
- What are the Justice Department's policies regarding the level of technical expertise and access to software source code an officer should possess before prosecutors call him or her to testify about the software's functioning and results? Before an officer or agent may attest to the software's results in a search warrant application?
- Does the Justice Department require federal agents to receive training before using CPS? If so, what is the content of this training?

### Free Speech

- Has the Justice Department assessed what proportion of files designated as "Child Notable" in CPS or relevant databases constitute unlawful child sexual exploitation images under federal or state law?
- Has the Justice Department analyzed the First Amendment implications of law enforcement use of CPS?

### Personal Data and Discrimination Concerns

- Does the Justice Department permit agents to view subscriber data offered by CRC or TLOxp?
- Does the Justice Department believe logs should be kept of law enforcement access to such data? Are such logs kept?
- If agents are permitted to view the data, what types of information are included? What information links individuals' identities to IP addresses, and from what source does that information come?
- Has the Justice Department analyzed whether the protections of the FCRA apply, or should be applied as a matter of policy, to data from TLOxp or CRC? If so, what were the conclusions of this analysis and in what document(s) do they appear?

### Parallel Construction

- What are the Justice Department's positions concerning the disclosure of an agent's viewing or use of subscriber data from CRC or TLOxp to courts and defendants? Does the Justice Department require such disclosure if law enforcement subsequently obtains the information in question from other sources?
- Is the Justice Department aware of any use of parallel construction to conceal aspects of investigations involving CPS?
- Does the Justice Department have in place any rule, guidance or measure to prevent or disclose the use of parallel construction in obtaining evidence?

### Correcting Mistakes

- What are the Justice Department's policies and practices regarding the identification and treatment of investigative data incorrectly linking an individual, IP address, or device to the possession or sharing of illicit files? What are its policies and practices

13



regarding whether and how people who may have been wrongly linked to such activities should be notified?

- What are the Justice Department's policies and practices regarding how electronic evidence linking an individual to a suspected offense should be stored and secured? Has the Justice Department determined that CRC is in compliance with these policies, if any?

**HRW.org**

\* \* \*

We are aware that CPS is not the only software that may be capable of monitoring file-sharing networks for allegedly illegal images, and many of our concerns about this software suite may also apply to other systems. We believe answers to the foregoing questions will assist Congress, the courts, and the public in understanding the Justice Department's treatment of both CPS and other comparable systems, and the broader issues raised by the use of such systems.

We thank you for your attention to this matter and await your response on or before February 18, 2019.

Sincerely,



Sarah St.Vincent
Researcher/Advocate on National Security, Surveillance, and Domestic Law Enforcement
Human Rights Watch

**Encl.**

Appendix: List of federal cases examined by Human Rights Watch

### Appendix:
### List of Federal Cases Examined by Human Rights Watch

*Federal prosecutions*

United States v. Baalerud (W.D.N.C., 3:14-cr-00188)

United States v. Brooks (M.D. Fla., 3:13-cr-00058)

HUMAN
RIGHTS
WATCH

**HRW.org**

United States v. Clements (N.D. Ohio, 1:15-cr-00275)

United States v. Crowe (D.N.M., 1:11-cr-01690)

United States v. Dang (D. Kan., 6:16-cr-10027)

United States v. Dennis (N.D. Ga., 3:13-cr-00010)

United States v. Dodson (W.D. Tex., 4:13-cr-00014)

United States v. Dunning (E.D. Ky., 7:15-cr-00004)

United States v. Hart (W.D. Wash., 3:14-cr-05507)

United States v. Hartman (C.D. Cal., 8:15-cr-00063)

United States v. Juhic (S.D. Iowa, 4:16-cr-00162)

United States v. Leikert (D. Vt., 5:12-cr-00097)

United States v. McKinion (C.D. Cal., 2:14-cr-00124)

United States v. Naylor (S.D.W. Va., 2:14-cr-00194)

United States v. Neale (D. Vt., 5:12-cr-00044)

United States v. Ocasio (W.D. Tex., 3:11-cr-02728)

United States v. Pirosko (N.D. Ohio, 5:12-cr-00327)

United States v. Price (S.D. Fl., 0:12-cr-60016)

United States v. Shia (N.D. Cal., 3:15-cr-00257)

United States v. Thomas (D. Vt., 5:12-cr-00037)

*Federal civil actions*

Brushaber v. Jackson County, Mississippi et al. (S.D. Miss., 1:13-cv-00453)

Pardue v. Jackson County, Mississippi et al. (S.D. Miss., 1:14-cv-00290)

Peairs v. Jackson County, Mississippi et al. (S.D. Miss., 1:13-cv-00402)

Tuskan v. Jackson County, Mississippi et al. (S.D. Miss., 1:13-cv-00356)

# EXHIBIT

# B

*** The Child Protection System (CPS)  - Acceptable Use Requirements ***

By using this tool you acknowledge and agree to:

I understand all software utilizing to The Child Protection System (CPS) requires a license. Licenses are issued to individual investigators and can only be used by the license holder unless otherwise authorized by the intellectual property owner.  Where software is restricted to law enforcement agency use, users must discontinue use of the system if they are no longer in good standing with their law enforcement agency.  Individuals who change agencies must obtain a new license so as to preserve historic or transactional data.

I am the authorized user associated with this license and am in good standing with my law enforcement agency. I am authorized by my agency to investigate or assist in the investigation of child exploitation crimes.

This software supports active law enforcement investigations; therefore no persons shall publicly demonstrate this system or the software provided without the expressed permission of the software owner. Users who expose data obtained through this system to non-law enforcement without expressed permission may have their licenses suspended.

Users of the provided software shall not reverse engineer or in any other way attempt to circumvent the intellectual property rights of the software owner or server provider.  Those using the software must conform to the license and use agreements established by the owners of both client and server applications.

I understand that records related to peer-to-peer investigations are stored on servers belonging to a credentialed law enforcement entity.  I understand that other participating law enforcement agencies may have need to access that data where it is appropriate and related to their investigations.  I understand that this information will remain permanently available to all related agencies, even if I cease to use the system or withdraw in any way from law enforcement.

Users of this system are required to deconflict their investigations. If you use the query system to identify offenders you are free to conduct your investigation in the manner supported by your agency but you are required to log your investigative interest in the given IP, moniker, etc. using the provided tools.  You shall not use this system in conjunction with investigations that initiate investigations outside of your jurisdiction unless you have received a previous agreement from the corresponding jurisdiction (This does not apply to situations where the investigative lead appeared to originate in your jurisdiction but was later determined to be elsewhere).

Exhibit B, p. 1

No user of the system may sell or otherwise profit from the use of the CPS, the resulting leads, or related software without the expressed permission of the intellectual property owner. Approved tools that are offered for distribution must be free to law enforcement, authorized to work the related investigations. Additionally, all training materials developed for tools offered for distribution must be made available to all users of the related software without cost for use or distribution. This information is law enforcement sensitive.

With the exception of peer-to-peer locate information, all data must be verified with the appropriate source agency prior to any law enforcement action.

Shared data may be segregated as needed to maintain operational security. System activity is logged on law enforcement servers only. Communications with other servers from these applications is not logged.

Use of this system, the software and the related data and features is a privilege and may be revoked at any time.

Additional guidelines and requirements will be added as the situation warrants.

Unconfirmed Subscriber Data provided by TLO is unconfirmed. It originates from a variety of sources and is subject to omission, alteration or misrepresentation. Do not use this data for probable cause. It must be confirmed through other investigative means that are acceptable with your agency and prosecuting attorney. TLO provides no warranty or guarantee of any kind regarding data provided free to law enforcement and assumes no responsibility for the use of software or resulting information. You agree to indemnify, defend and hold harmless TLO and its suppliers from any and all claims arising from or relating to your use of the software or data obtained from TLO. Commercially reasonable efforts will be made to keep these servers available and the resulting services shall remain perpetually free to law enforcement engaged in child exploitation investigations.

Failure to follow any of these conditions may result in the suspension or revocation of your license.

# EXHIBIT

# C

Case 1:18-cv-01339-CRC   Document 69   Filed 06/19/19   Page 21 of 37
Case: 7:15-cr-00004-DCR-EBA   Doc #: 25-4   Filed: 08/26/15   Page: 15 of 22 - Page ID#:
143

# The Child Protection System

Child Protection System, or CPS, is a suite of programs centered on a web-based interface that provides access to investigative data gathered by automated tools and law enforcement searches. Traditionally IP based investigations have not allowed law enforcement to associate IP information with user data. By using CPS, investigators now have the option to correlate various data sources with IP addresses and screen names involved in criminal activity. All reports follow a standard convention in an easy to read format, which allows the investigator the ability to associate information.

The Child Protection System (CPS) allows trained investigators to identify offenders using peer-to-peer networks to distribute child pornography. Information is gathered by various automated tools and manual searches by law enforcement and accessed through CPS. This data can be used by investigators to gather, profile and track information tied to an Internet Protocol address (IP address) of the offender.

The Child Protection Systems provides a number of benefits to investigators. CPS future enhancements continue; here are a few of the current features:

- Investigators can quickly view activity of a specific IP address including other investigator interests in the IP address.
- Search by usernames (for example, superdad38@yahoo.com).
- File hashing – Files hash values in various formats.
- GUID (Globally Unique Identifier) histories reveal if other investigators have previously identified, shared interests and location information about that GUID. A GUID also may allow offender tracking across multiple IPs.
- Address searches reveal if other investigators have shared interest in an address (important for deconfliction). Latitude and longitude can be used to map addresses.
- Phone number searches reveal if other investigators have shared interest in an address (important for deconfliction).
- Service Providers provide legal contact information.

CPS is the web interface allowing the investigator to query the database, provide deconfliction, and investigative job creation. Licensed investigators, using their Gridcop username and password, may access the site at https://cps.gridcop.com.

## CPS Data Sources

In CPS, the investigator has access to different data sources. Traditionally, all data generated by law enforcement personnel, or tools written by law enforcement, have been stored on servers located at the Wyoming Division of Criminal Investigation in Cheyenne, WY. In May of 2009, when the Wyoming servers failed, a second set of servers, purchased by TLO in Florida, and donated to the State Attorney for the Fifteenth Judicial Circuit, came online to provide replication, and are synchronized, allowing for redundancy, should one fail. Wyoming Toolkit users and automated tools such as Peer Spector contribute data to these servers.

With the assistance of TLO, an additional set of law enforcement only servers was added in Florida to store the increased volume of data generated by the software tools written by corporate

employees. These tools, including various crawlers and Peer Spectre2 (covered in other manuals), have the ability to capture more complete data on P2P targets, including GUIDs, firewall information, and push proxies (intermediary for requests).



The investigator also has the option of including private data sources in reports generated through CPS. TLO has allowed law enforcement access to data collected on Internet users from a variety of sources. This data includes marketing data that has been linked to IP addresses and email accounts from corporate sources. This data is considered unverified subscriber information and should never be considered a replacement for the subpoena or legal process, but is provided as intelligence information only. No logs are kept of any law enforcement query of corporate data, and TLO has no access to any law enforcement server.

When a law enforcement officer initiates a query, it is first directed to one of the two Fairplay servers where deconfliction is handled; the request is then sent to the TLO law enforcement server where the results are compiled. If the investigator chooses, the query is then sent to the corporate database for any unconfirmed subscriber information. The transaction with the corporate server is one-way and nothing is logged on the corporate server.

## CPS Main Page

The home screen of CPS is divided into two main sections:

**Manual searches.** These text boxes allow searches for individual types of data, such as usernames, IP addresses, file hashes, GUIDs and other information.

**Preformatted reports.** These links provide access to the most commonly used queries. The user may drill down further in each report, depending on the level of information needed.



# EXHIBIT

# D





*Photo illustration: David Sleight/ProPublica; child silhouette: Raúl Vázquez/EyeEm via Getty Images; laptop: Tawatchai Prakobkit/EyeEm via Getty Imagees; background texture: The7Dew via Getty Images*

# Prosecutors Dropping Child Porn Charges After Software Tools Are Questioned

More than a dozen cases were dismissed after defense attorneys asked to examine, or raised doubts about, computer programs that track illegal images to internet addresses.

by Jack Gillum, April 3, 5 a m. EDT

*ProPublica is a nonprofit newsroom based in New York. Sign up for ProPublica's Big Story <https://go.propublica.org/20190319> newsletter to receive stories like this one in your inbox as soon as they are published.*

Using specialized software, investigators traced explicit child pornography to Todd Hartman's internet address. A dozen police officers raided his Los Angeles-area apartment, seized his computer and arrested him for files including a video of a man ejaculating on a 7-year-old girl. But after his lawyer contended that the software tool inappropriately accessed Hartman's private files, and asked to examine how it worked, prosecutors dismissed the case.

Near Phoenix, police with a similar detection program tracked underage porn photos, including a 4-year-old with her legs spread, to Tom Tolworthy's home computer. He was indicted in state court on 10 counts of

# ℙ PROPUBLICA

At a time when at least half a million laptops, tablets, phones and other devices are viewing or sharing child pornography on the internet every month, software that tracks images to specific internet connections has become a vital tool for prosecutors. Increasingly, though, it's backfiring.

Drawing upon thousands of pages of court filings as well as interviews with lawyers and experts, ProPublica found more than a dozen cases since 2011 that were dismissed either because of challenges to the software's findings, or the refusal by the government or the maker to share the computer programs with defense attorneys, or both. Tami Loehrs, a forensics expert who often testifies in child pornography cases, said she is aware of more than 60 cases in which the defense strategy has focused on the software.

Defense attorneys have long complained that the government's secrecy claims may hamstring suspects seeking to prove that the software wrongly identified them. But the growing success of their counterattack is also raising concerns that, by questioning the software used by investigators, some who trade in child pornography can avoid punishment.

"When protecting the defendant's right to a fair trial requires the government to disclose its confidential techniques, prosecutors face a choice: Give up the prosecution or give up the secret. Each option has a cost," said Orin Kerr <https://gould.usc.edu/faculty/?id=73523>, an expert in computer crime law and former Justice Department lawyer. "If prosecutors give up the prosecution, it may very well mean that a guilty person goes free. If prosecutors give up the secret, it may hurt their ability to catch other criminals. Prosecutors have to choose which of those outcomes is less bad in each particular case."

In several cases, like Tolworthy's, court documents say that the software traced offensive images to an Internet Protocol address. But, for reasons that remain unclear, those images weren't found on the defendant's computer. In others, like Hartman's, defense lawyers said the software discovered porn in areas of the computer it wasn't supposed to enter, and they suggested the police conducted an overly broad search.

These problems are compounded by the insistence of both the government and the software manufacturers on protecting the secrecy of their computer code, so as not to imperil other prosecutions or make trade secrets public. Unwilling to take the risk that the sensitive programs could leak publicly, they have rejected revealing the software even under strict court secrecy.



~~examine it. And recently, the nonprofit Human Rights Watch~~ asked the Justice Department *<https://www.documentcloud.org/documents/5788168-Porn-Story-Documents.html#document/p17/a491807>* to review, in part, whether one suite of software tools, the Child Protection System, had been independently tested.

"The sharing of child-sex-abuse images is a serious crime, and law enforcement should be investigating it. But the government needs to understand how the tools work, if they could violate the law and if they are accurate," said Sarah St.Vincent, a Human Rights Watch researcher who examined the practice.

"These defendants are not very popular, but a dangerous precedent is a dangerous precedent that affects everyone. And if the government drops cases or some charges to avoid scrutiny of the software, that could prevent victims from getting justice consistently," she said. "The government is effectively asserting sweeping surveillance powers but is then hiding from the courts what the software did and how it worked."

The dismissals represent a small fraction of the hundreds of federal and state child pornography prosecutions since 2011. More often, defendants plead guilty in exchange for a reduced sentence. (Of 17 closed cases brought since 2017 by the U.S. attorney's office in Los Angeles, all but two resulted in plea deals, ProPublica found.) Even after their charges were dropped, Tolworthy and Hartman are both facing new trials. Still, the dismissals are noteworthy because challenges to the software are spreading among the defense bar and gaining credence with judges.

Software developers and law enforcement officials say the detection software is an essential part of combating the proliferation of child pornography and exploitation on the internet.

"This is a horrendous crime, and as a society we're obligated to protect victims this young," said Brian Levine, a computer science professor at the University of Massachusetts at Amherst who helped develop one such tool, called Torrential Downpour. "There are a number of victims who are too young to speak, or can't speak out of fear. This tool is available to law enforcement to rescue those children who are abused."

In cases where previously flagged porn isn't turning up on a suspect's computer, investigators have suggested the files have merely been erased before arrest, or that they're stored in encrypted areas of a hard drive that the police can't access. Defense attorneys counter that some software logs



often say that they're prohibited from disclosing software by their contracts with the manufacturer, which considers it proprietary technology.

Prosecutors are also reluctant to disclose a coveted law enforcement tool just to convict one defendant. A Justice Department spokeswoman referred ProPublica to a government journal article, which argued peer-to-peer detection tools "are increasingly targeted by defendants through overbroad discovery requests."

"While the Department of Justice supports full compliance with all discovery obligations imposed by law," wrote <https://www.justice.gov/usao/page/file/1030666/download> lawyers for the Justice Department and the FBI, "those obligations generally do not require disclosure of sensitive information regarding law enforcement techniques which, if exposed, would threaten the viability of future investigations."

One former Justice Department prosecutor said the government has shielded software in criminal cases for fear that disclosure could expose investigators' capabilities or classified technology to criminals.

"They don't want to reveal that in a case because it can be the last time they use it," said the lawyer, who requested anonymity because of the sensitive nature of the topic. "It sounds like they may, in some circumstances, be using programs that are never intended to see the light of day in the criminal justice system."

---

The government's reluctance to share technology with defense attorneys isn't limited to child pornography cases. Prosecutors have let defendants monitored with cellphone trackers <https://www.sandiegouniontribune.com/sdut-baltimore-police-often-surveil-cellphones-amid-us-2015apr09-story.html> known as Stingrays go free rather than fully reveal the technology. The secrecy surrounding cell tracking was once so pervasive in Baltimore that Maryland's highest court rebuked the practice as "detrimental." As was first reported <https://www.reuters.com/article/us-dea-irs/exclusive-irs-manual-detailed-deas-use-of-hidden-intel-evidence-idUSBRE9761AZ20130807> by Reuters in 2013, the U.S. Drug Enforcement Administration relied in investigations on information gathered through domestic wiretaps, a phone-records database and National Security Agency intercepts, while training agents to hide those sources from the public record.



"If the defense isn't able to examine these techniques, then we have to just take the government's word for it — on these complicated, sensitive and non-black-and-white decisions. And that's just too dangerous."

The software programs used by investigators scan for child porn on peer-to-peer networks, a decentralized connection of computers on the internet where users share files directly with one another. Those networks behave similarly to software like Napster, the popular file-sharing program used to download music in the early days of the commercial internet.

Although Napster may have faded, the trading of child pornography on peer-to-peer networks hasn't. To keep up, police rely on modified versions of popular peer-to-peer programs to flag IP addresses of suspected child pornography, enabling investigators to subpoena the internet provider and unearth the internet subscriber. They then obtain a search warrant for computers at the physical location they say is involved in sharing porn.

One common suite of software tools, the Child Protection System, is maintained by the Florida-based Child Rescue Coalition <https://childrescuecoalition.org/>. Although the coalition says it's a nonprofit, it has ties to for-profit data brokers and the data company TLO. (TransUnion, the major credit-reporting agency, has acquired TLO.) CRC has hosted some of its computer servers at TransUnion since 2016, according to a review of internet records collected by the firm Farsight Security.

A redacted user manual filed in a federal case, portions of which were un-redacted by Human Rights Watch and confirmed by ProPublica, indicates that the Child Protection System draws on unverified data gathered by these firms. It says TLO <https://www.documentcloud.org/documents/5788168-Porn-Story-Documents.html#document/p33/a491809> "has allowed law enforcement access to data collected on internet users from a variety of sources," with enhanced information that includes "marketing data that has been linked to IP addresses and email accounts from corporate sources."

"No logs are kept of any law enforcement query of corporate data," the manual continued <https://www.documentcloud.org/documents/5788168-Porn-Story-Documents.html#document/p33/a491809>. It cautioned that subscriber data was unconfirmed, and that it should "be confirmed through other investigative means that are acceptable with your agency and prosecuting attorney."

Software that relies on unconfirmed information from big data brokers, civil liberties advocates say, may not only point police to the wrong internet address owner, but it also enables them to gather a mountain of

**Ɖȷ PROPUBLICA**

quash a subpoena to reveal the software known as the Child Protection
System in a child-porn case. The materials sought, they said, "are
protected under the law enforcement privilege and trade secrets laws."
After the judge ordered the software produced, prosecutors instead agreed
to a plea deal that favored the defendant; he was sentenced to three years
he had already served for "transportation of obscene material."

CRC says on its website that its software is used in every state and more
than 90 countries, and has tracked more than 54 million offenders. CRC
President William Wiltse, a former Oregon police officer, has testified for
the prosecution in cases in which investigators relied on the Child
Protection System.

CRC did not respond to phone and email inquiries from ProPublica this
month about its software. It told
<https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p52/a491811> Human Rights Watch this year, "As a
policy, we do not publicly share details of how we identify sex offenders
online, as we do not want predators to learn better ways to hide their illegal
activity." A spokesman for TransUnion, which now owns TLO, said the
company "supports Child Rescue Coalition in its work with law
enforcement to protect children from sexual exploitation online."

Another widely used detection tool, Torrential Downpour, was developed
by the University of Massachusetts a decade ago with U.S. government
funding, court records show <https://www.documentcloud.org/documents/5788168-
Porn-Story-Documents.html#document/p53/a491813>. Levine told ProPublica in an
interview that the program is accurate enough to find probable cause for a
search warrant, but that it can only be effective if police and the courts do
their jobs.

"The software is one part of an entire process," Levine said, "followed by
investigators and courts to produce reliable evidence and to follow a fair
judicial process."

———————————————————

Investigators using Torrential Downpour said they turned up damning
evidence to ensnare Tolworthy, a software engineer from Mesa, Arizona.
They accused him <https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p57/a491814> of possessing illicit files that included
"Pedo Baby 03 - 2 yo Photos 56.jpg." His IP address was "involved in



downloaded," Snyder replied that references to the images were part of a
torrent file — a kind of digital index that asks to download specific images
or movies. But, he said, "We have not conducted a thorough enough
investigation of the computers through our forensics yet to find those
particular files."

In other words, the state couldn't say if half the files Tolworthy, 44, was
arrested for possessing — and that were identified by the software — were
indeed on his computer. After prosecutors assured grand jurors that the
investigation was continuing, they indicted him anyway.

Yet by late 2016, Tolworthy's defense expert began raising doubts about
whether the files existed. "I was unable to locate the torrent, the info hash
or the files of child pornography identified during the undercover
investigation," Loehrs said in an affidavit
*<https://www.documentcloud.org/documents/5788168-Porn-Story-*
*Documents.html#document/p65/a491817>* after conducting her own search of
Tolworthy's hard drive.

"In addition, the torrent, the info hash and the files of child pornography
were not found by the State's forensic examiner, either," she wrote.

That "info hash," as it's called, is a fingerprint that identifies computer
files, which investigators match against a database of known child porn.
That's how police detect illegal files that might have been renamed with
mundane-sounding headings (such as "sunset.jpg") to avoid detection.
The hash is also important to the defense, Loehrs said, because a computer
might mistakenly broadcast the hash of a downloaded file when, in fact,
it's the hash of a movie or video a user merely requested — sometimes by
accident.

Arizona Superior Court Judge Mark Brain found the defense arguments
persuasive. He said *<https://www.documentcloud.org/documents/5788168-Porn-Story-*
*Documents.html#document/p69/a491818>* it appeared that Tolworthy had "a
substantial need for the software" and ruled in February 2017 that
Tolworthy's lawyers could ask for it.

The defense pressed for the software program, but the University of
Massachusetts balked. Its lawyer said in a court document
*<https://www.documentcloud.org/documents/5788168-Porn-Story-*
*Documents.html#document/p54/a491904>* that handing over the software would
"destroy its value to the university and its faculty researcher," citing a
$440,000 annual FBI grant. "Releasing it to public view would frustrate



suspect's computer, some of the cases have unraveled, largely due to the
government's penchant for secrecy.

After the Child Protection System led police to illicit files on Hartman's
hard drive, such as <https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p75/a491822> the video "Cumming over loli_s pussy
2010 7yo and Dad Brilliant.wmv," the former church youth counselor
<https://www.ice.gov/news/releases/former-orange-county-church-youth-counselor-
indicted-child-pornography-charges> faced up to 50 years in prison if convicted.
Hartman pleaded not guilty and his public defender, Andrea Jacobs, asked
to inspect the software.

Prosecutors said its disclosure
<https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p86/a491823> would allow child pornographers to
evade detection. They also noted that the Child Protection System is
available to law enforcement under a strict agreement
<https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p91/a491824> that maintains its secrecy: "No persons
shall publicly demonstrate this system or the software provided without
the expressed permission of the software owner."

To counter the evidence of child pornography turned up by Child
Protection System, Hartman's lawyer contended that an examination of
the software was critical to his defense. The detection program, Jacobs
said, likely searched files in private areas on his computer that weren't ever
meant to be found on peer-to-peer networks. Hartman, his expert said
<https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p93/a491826>, had not shared the hundreds of
images in four of the six files allegedly identified by Child Protection
System and downloaded by a Newport Beach, California, police officer
during the investigation. And the last time that the two remaining files
were shared had been three months before the investigation started, so the
software should not have caught them, she said.

Only the software itself could show whether it went too far, and the
prosecution and the manufacturer refused to reveal the program. As a
result, "Despite ample opportunity to do so, the government has not
refuted this testimony," U.S. District Judge Josephine Staton wrote in
November 2015 <https://www.documentcloud.org/documents/5788168-Porn-Story-
Documents.html#document/p120/a491828>. She sided with Hartman's lawyer and
ordered disclosure of the software.



downloading it, or they might encrypt their computers to prevent illicit materials from being found.

Prosecutors first indicated they'd drop only the charges associated with the search and leave those arising from images found on another computer during a search of Tolworthy's house. In April 2018, though, they dismissed <http://ocuments.html#document/p72/a491820> all charges, saying it was "in the interests of justice." They have since re-filed charges against Tolworthy relating in part to the material on the old computer; that case is pending in state court.

Tolworthy, through his lawyer, declined to comment. Maricopa County Attorney's Office spokeswoman Amanda Steele said there was no policy to dismiss charges rather than disclose secretive software tools. "Prosecutors regularly review cases to ensure appropriate charges are filed and just results are achieved," she said.

The Tolworthy saga is strikingly similar to another Arizona case, which is in federal court. In late 2016 and early 2017, Torrential Downpour identified child pornography at the IP address of Anthony Gonzales, who lived with his family in Surprise, Arizona, northwest of Phoenix. As in the Tolworthy case, the files previously tagged by investigators online weren't found on Gonzales' computer, but police say other contraband turned up on a tablet after his house was searched. Gonzales pleaded not guilty.

In February, the judge ordered <https://www.documentcloud.org/documents/5788168-Porn-Story-Documents.html#document/p15/a491806> the software turned over to the defense. Loehrs, the expert for Gonzales as well as Tolworthy, "opined that all software programs have flaws, and Torrential Downpour is no exception," U.S. District Judge David Campbell wrote.

"Defendant Gonzales has done more than simply request access to the software and argue that it is material to his defense," the judge wrote. "He has presented evidence that calls into question the government's version of events."

Both sides in the pending case are in discussions about how to test the software, according to a person familiar with the matter.

"It matters to find out whether the government is abiding by the law and the Constitution," said Barbara Hull, a Phoenix lawyer representing

 **PROPUBLICA**

~~documonta.html  aboumont/p100/o401020~~ .

She promised an answer by Jan. 19, 2016. The next day, she dismissed the case in a one-sentence filing *<https://www.documentcloud.org/documents/5788168-Porn-Story-Documents.html#document/p133/a491830>*.

Jacobs, who is no longer representing Hartman, told ProPublica she couldn't discuss the case. Hartman's mother did not respond to an interview request, and family staying at his house in Yorba Linda, California, did not answer a knock at the door and a written message left by a ProPublica reporter in mid-March.

As with Tolworthy, the dismissal didn't end Hartman's legal troubles. He was later charged in California state court under child-porn and child-sex laws. That case is pending.

Both Tolworthy and Hartman are in jail awaiting trial.

*Claire Perlman contributed to this report.*

*Do you have access to information about secretive uses of technology that should be public? Email jack.gillum@propublica.org. Here's how to send tips and documents <https://www.propublica.org/article/how-to-leak-to-propublica> to ProPublica securely.*

**Jack Gillum**

Jack Gillum is a senior reporter at ProPublica covering technology, specializing in how algorithms, big data and social media platforms affect people's daily lives and civil rights

✉ jack.gillum@propublica.org   🐦 @jackgillum   ▯ 202-886-9504

🔒 Signal: 202-854-9062

Pg. 3

Nevertheless, the software is facing renewed scrutiny: In another case where child pornography identified by the software wasn't found on the suspect's computer, a federal judge in February allowed a defense expert to examine it. And recently, the nonprofit Human Rights Watch asked the Justice Department to review, in part, whether one suite of software tools, the Child Protection System, had been independently tested.

> **Commented [JP1]:** Link is pg 15 lines 1-8 of 134 pg document
>
> **Commented [JP2]:** Link is Letter from Human Rights Watch to DOJ of 134 pg document

Pg. 10

Prosecutors stalled. "The government has made substantial progress, but is requesting additional time because items pivotal to the requested testing are in the possession of a non-governmental entity" that also owns the intellectual property, Assistant U.S. Attorney Anne Gannon said on Jan. 8, 2016.

# EXHIBIT E

CRIMINAL JUSTICE

# The Feds Are Dropping Child Porn Cases Instead of Revealing Info on Their Surveillance Systems

Human Rights Watch and other groups say these systems draw serious concerns.

ELIZABETH NOLAN BROWN | 4 24 2019 12 15 PM



The Department of Justice has been dismissing child pornography cases in order to not reveal information about the software programs used as the basis for the charges.

An array of cases suggest serious problems with the tech tools used by federal authorities. But the private entities who developed these tools won't submit them for independent inspection or hand over hardly any information about how they work, their error rates, or other critical information. As a result, potentially innocent people are being smeared as pedophiles and prosecuted as child porn collectors, while potentially guilty people are going free so these companies can protect "trade secrets."

The situation suggests some of the many problems that can arise around public-private partnerships in catching criminals and the secretive digital surveillance software that it entails (software that's being employed for far more than catching child predators).

With the child pornography cases, "the defendants are hardly the most sympathetic," notes Tim Cushing at *Techdirt*. Yet that's all the more reason why the government's antics here are disturbing. Either the feds initially brought bad cases against people whom they just didn't think would fight back, or they're willing to let bad behavior go rather than face some public scrutiny.

An extensive investigation by *ProPublica* "found more than a dozen cases since 2011 that were dismissed either because of challenges to the software's findings, or the refusal by the government or the maker to share the computer programs with defense attorneys, or both," writes Jack Gillum. Many more cases raised issues with the software as a defense.

"Defense attorneys have long complained that the government's secrecy claims may hamstring suspects seeking to prove that the software wrongly identified them," notes Gillum  "But the growing success of their counterattack is also raising concerns that, by questioning the software used by investigators, some who trade in child pornography can avoid punishment."

Courts have sought to overcome concerns that scrutiny would diminish the effectiveness of the software for law enforcement or infringe on intellectual property rights by ordering only secret and monitored third-party review processes. But federal prosecutors have rejected even these compromises, drawing worry that it's not legitimate concerns driving their secrecy but a lack of confidence in the software's efficacy or some other more nefarious reason.

Human Rights Watch (HRW) has raised questions about how much data (not just on defendants but on all Americans) these programs have been accessing and storing.

In February, HRW sent a letter to Justice Department officials expressing concerns about one such program, called the Child Protection System (CPS). TLO, the company behind the CPS system, has intervened in court cases to prevent disclosure of more information about the program or independent testing of it.

"Since the system is designed to flag people as suspected of having committed crimes, both its error rates and its potential to exceed constitutional bounds have implications for rights," HRW states. Yet "it is unclear what information the Justice Department has about CPS' potential for error (and on what basis)."

Prosecutors say they can't share any details about it "because it is proprietary and not in the government's possession," notes HRW, which since 2016 has been researching cases involving the CPS system. "We fear that the government may be shielding its methods from scrutiny by relying on its arrangements with the non-profit," states HRW. (Read more here.)

Another tool used in these cases, Torrential Downpour, was developed by the University of Massachusetts. The school has been fighting against the release of more information about Torrential Downpour, too. But defendants' lawyers say it's necessary after the program alerted authorities about alleged child porn on computers that couldn't actually be found anywhere on the physical devices.

"An examination of the software being used to build cases should be allowed, but the entities behind the software won't allow it and the government is cutting defendants loose rather than giving them a chance to properly defend themselves against these very serious charges," writes Cushing. "I supposed it ultimately works out for defendants, but it only encourages the government to tip the scales in its favor again when the next prosecution rolls around with the hopes the next defender of the accused isn't quite as zealous"

Plus, if these defendants really are innocent, than the government has publicly and falsely smeared them as sickos and then balked at allowing them a true opportunity to clear their names.

"These defendants are not very popular, but a dangerous precedent is a dangerous precedent that affects everyone," HRW's Sarah St.Vincent told ProPublica. "And if the government drops cases or some charges to avoid scrutiny of the software, that could prevent victims from getting justice consistently. The government is effectively asserting sweeping surveillance powers but is then hiding from the courts what the software did and how it worked."

CRIMINAL JUSTICE    DEPARTMENT OF JUSTICE    FBI    PORNOGRAPHY    CHILD PORNOGRAPHY    SEX CRIMES    TECHNOLOGY

---

ELIZABETH NOLAN BROWN is an associate editor at *Reason*.
