**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**JAMES PRICE**,

*Pro se* Plaintiff,

v.

**UNITED STATES DEPARTMENT OF JUSTICE**, *et al.*,

Defendants.

Case No. 18-cv-1339 (CRC)

---

**MEMORANDUM OPINION**

James Price is currently serving a 156-month sentence of imprisonment for federal child pornography offenses.  In 2017 and 2018, he submitted a series of Freedom of Information Act ("FOIA") requests to the Department of Justice ("DOJ") seeking information related to the Department's investigation and prosecution of particular child pornography cases as well as general information about the Department's procedures and employees.  Unsatisfied with the agency's responses, Price filed suit against DOJ.  Before the Court are the parties' cross-motions for summary judgment on Price's FOIA claims.  Finding that the record is deficient with respect to certain searches and withholdings, the Court will grant the Government's motion for summary judgment in part, deny it in part, and remand the case to the agency for further action consistent with this opinion.

I.    **Background**

A.    Factual Background

In June 2012, Price was convicted by a jury in the United States District Court for the Southern District of Florida of various child pornography offenses.  Minute Entry, United States v. Price, No. 12-cr-600016-KMW (S.D. Fla. June 29, 2012), ECF No. 92.  He was sentenced to

156 months imprisonment, followed by 25 years of supervised release.  Judgment, <u>United States v. Price</u>, No. 12-cr-600016-KMW (S.D. Fla. Apr. 11, 2013), ECF No. 122.  Price appealed his convictions, and the Eleventh Circuit affirmed.  <u>United States v. Price</u>, 582 F. App'x 846, 853 (11th Cir. 2014).

Suspecting that something was amiss in the Government's investigation and prosecution of him and similar offenders, Price lodged nine FOIA requests in 2017 and 2018 seeking information from several components within DOJ relating to child pornography investigations and prosecutions.  One of Price's requests was forwarded to the Criminal Division's FOIA Unit, and the rest were handled by the Office of Justice Programs ("OJP").  The Court outlines Price's requests and DOJ's responses below.

1. *Requests Forwarded OJP*

a. <u>OJP Request No. 17-00209</u>

In May 2017, Price submitted a FOIA request to DOJ for "any and all reports, documentation, and data" kept by the Internet Crimes Against Children Task Force ("ICAC-TF") that were related to "case number 11-17890" as well as all case tracking reports and monthly performance reports maintained by the ICAC-TF for certain time periods between 2010 and 2012.  Decl. of Monica Potter-Johnson ("Potter-Johnson Decl."), Gov. Mot. for Summ. J., Exh. 3, Attach. A at 1–2.  The request was forwarded to OJP, which acknowledged receipt and sent a search letter to its Office of Juvenile Justice and Delinquency Prevention ("OJJDP").  <u>Id.</u> ¶¶ 4, 15, Attach. B at 1–2, Attach. C at 1.  OJJDP subsequently searched its grant management system, monthly performance reports, and case tracking reports.  <u>Id.</u> ¶ 24.  The search did not reveal any documents responsive to Price's case-specific request but did turn up six documents that pertained to his more general request for the ICAC-TF's case tracking and performance reports.

Id., Attach. D at 1.  The responsive documents, totaling 26 pages, were released to Price with some redactions under FOIA Exemption 6.  Id., Attach. D at 1–2.

### b.  OJP Request No. 18-00059

In October 2017, Price submitted a more expansive FOIA request to DOJ for various manuals, organizational charts, and case indexes.  Id., Attach. A at 3–4.  The portion of the request which sought the operating manual of the ICAC-TF was handled by OJJDP, and, as will be explained, the rest was handled by the Criminal Division.  Id., Attach. C at 2.  OJJDP conducted a search and determined that it did not have any "Operations Manual" for the ICAC-TF.  Id. ¶ 25, Attach. D at 3.

### c.  OJP Request No. 18-00136

In January 2018, Price filed another FOIA request with DOJ, in which he sought charts, detailed reports, and summary reports concerning all expenditures, grants, reimbursements, and disbursements of OJP and any entity receiving funds under the Protect Act, 42 U.S.C. § 17601 *et seq*. for fiscal years 2008–2017.  Id., Attach. A at 5–8.  Price's request was forwarded to OJJDP and OJP's Office of the Chief Financial Advisor.  Id. ¶ 26, Attach. C at 3.  After processing the responsive documents sent by OJJDP and the Office of the Chief Financial Advisor, OJP released two responsive documents in full, totaling 25 pages.  Id., Attach. D at 5.

### d.  OJP Request No. 18-00150

Price's January 2018 FOIA request also demanded "the names, titles, organizations, and terms of service for the current and past members of the National Internet Crimes Against Children Data Systems Steering Committee" and all of the committee's appropriations and expenditures for fiscal years 2008 to 2017.  Id., Attach. A at 9.  OJP sent a search letter to

OJJDP.  Id. ¶ 18, Attach. C at 4.  OJJDP conducted a search but turned up no responsive

documents.  Id. ¶ 27, Attach. D at 7–8.

         e.   OJP Request Nos. 18-00156 & 18-00157

In February 2018, Price emailed OJP with another FOIA request, this time for a summary

report by year of the total number of "Secure Harsh Algorithm version 1 ('SHA-1') values"

identified or reported by the South Florida ICAC-TF from 2008 to 2017 (deemed Request No.

18-00156).  Id., Attach. A at 11.  He also included a request for all case tracking reports created

by the task force for Case No. LC-10-12-141 (deemed Request No. 18-00157).  Id., Attach. A at

12.  OJP sent search letters concerning both requests to OJJDP.  Id. ¶¶ 19–20, Attach. C at 5–6.

OJJDP conducted a search and turned up no responsive documents for the first request and 100

pages of responsive documents for the second.  Id. ¶¶ 28–29.  OJP released the responsive

documents to Price with some withholdings under FOIA Exemption 6.  Id., Attach. D at 11–12.

         f.   OJP Request No. 18-00260

In May 2018, Price submitted yet another FOIA request to OJP for records concerning a

federal criminal investigation of another child pornography offender, Sheldon Joel Ramnaraine,

including all reports, records, memoranda, and communications made during that investigation

as well as various computer code values and digital signatures of files discovered during that

investigation.  Id., Attach. A at 13–20.  OJP forwarded the request to OJJDP.  Id., Attach. C at 7.

OJJDP searched the ICAC-TF portal and grants management system and found responsive

documents but withheld them in full under FOIA Exemptions 7(E) and 7(F).  Id., Attach. D at

13–14.

g.  OJP Request No. 18-00288

In May 2018, Price filed another FOIA request seeking copies of a "Memorandum of Understanding" allegedly executed between OJJPDP and eight Florida-based law enforcement agencies and U.S. Attorney's Offices as well as the "Operational and Investigative Standards" of the National ICAC-TF Program.  Id., Attach. A at 22–23.  OJP sent a search letter to OJJDP.  Id., Attach. C at 8–9.  OJJDP's search turned up a single responsive document consisting of 17 pages, which was released to Price with redactions made pursuant to FOIA Exemption 7(E).  Id., Attach. D at 15–16.

h.  OJP Request No. 18-00294

Finally, Price's May 2018 FOIA request also sought additional records concerning Ramnaraine as well as inactive criminal investigations associated with specific case numbers, including interview and investigative notes, reports, affidavits, memoranda, communication produced during the investigations as well as various computer code and digital signatures of files uncovered through the investigations.  Id., Attach. A at 26–34.  OJP again forwarded the request to OJJDP.  Id. ¶ 12.  OJJDP searched the grants management system and the ICAC-TF portal and uncovered responsive documents.  Id. ¶ 32; Def. Stmt. Mat. Facts ¶ 44.  The documents were withheld in full pursuant to Exemptions 7(E) and 7(F).  Potter-Johnson Decl., Attach. D at 17–18.

2.  *Requests Forwarded to the Criminal Division*

As mentioned, portions of Price's October 2017 FOIA request were handled by the Criminal Division (denominated CRM Request No. 300634425).  Those portions included Price's demand for the organizational chart for the division's Child Exploitation and Obscenity Section ("CEOS"), the operating manual for the High Technology Investigations Unit ("HTIU"),

and an index of all cases and evidence processed by and referred to the HTIU in 2011 and 2012. Decl. of Amanda Marchand Jones ("Jones Decl.") ¶ 7, Gov. Errata, Exh. A, ECF No. 89-1.  The Criminal Division's FOIA Unit forwarded Price's request for the CEOS organizational chart to the Office of Administration of that section and the HTIU-related requests to that unit.  Id. ¶¶ 19–20, 23.

Five responsive documents were ultimately located: (1) CEOS Organizational Information (CRM Document No. 1); (2) CEOS Phone List (CRM Document No. 2); (3) CEOS Organizational Chart (CRM Document No. 3); (4) Index of HTIU cases from 2011–12 (CRM Document No. 4); and (5) HTIU Operations Manual, including appendices (CRM Document No. 5).  Id. ¶¶ 22, 25, 28–33; Decl. of Christina Butler ("Butler Decl.") ¶ 10, Gov. Reply, Exh. 1. CRM Document No. 1, consisting of six pages, was released in full.  Jones Decl. ¶ 29, Exh. F at 1.  Documents Nos. 2, 3, and 5 were released in part (thirteen full pages and ten partially redacted) with withholdings under FOIA Exemptions 2, 6, 7(C), 7(E), and 7(F).  Id. ¶¶ 28, 30– 31, 33, Exh. F at 1.  Document No. 4 was withheld in full under Exemptions 6, 7(C), and 7(F). Id. ¶ 32, Exh. F at 1.

B.  Procedural Background

Dissatisfied with the agency's responses to his FOIA requests, Price sued DOJ in November 2017 in the United States District Court for the Southern District of Florida.  In May 2018, that district granted Price's request to transfer the case to this Court.  In October 2018, Price moved to amend his complaint to include claims under the Administrative Procedure Act ("APA") and the Federal Records Act ("FRA") alleging that DOJ was actively engaged in a scheme to hide records.  Absent objection from the Government, the Court granted Price leave to amend the complaint.

In January 2019, Price filed a motion for a temporary restraining order and preliminary injunction concerning the FRA (via the APA) claims raised in Counts 1, 2, and 4 of the amended complaint.  The Court denied the motion.  See Price v. DOJ, No. 18-CV-1339 (CRC), 2019 WL 2526439, at *16 (D.D.C. June 19, 2019).  The parties proceeded to summary judgment briefing on Price's FOIA claims raised in Count 3 of the amended complaint.  The Court stayed resolution of Price's FRA/APA claims pending resolution of the FOIA dispute.  See Minute Order (July 25, 2019).[1]  The parties filed cross-motions for summary judgment on Price's FOIA claims.  At issue are the adequacy of the agency's searches and the propriety of its withholdings.

## II.   Legal Standards

FOIA cases are typically resolved through summary judgment.  See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011).  Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In defending the adequacy of a FOIA search, an agency must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." Ancient Coin Collectors Guild v. U.S. Dep't of State, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal quotation marks omitted).  The proper focus for this inquiry is "the reasonableness of [agency's] methods, not the quantity or quality of documents it unearths."  Am. Oversight v. DOJ, 401 F. Supp. 3d 16, 22 (D.D.C. 2019) (Cooper, J.).  An agency's search methods are

---

[1] Count 4 includes a FOIA "pattern or practice" claim.  Because this FOIA claim is inextricably linked with Price's FRA claim and the parties did not brief it, the Court will defer ruling on Count 4 and address it with Price's FRA/APA claims.

sufficient so long as they "can be reasonably expected to produce the information requested." Oglesby v. U.S. Dep't of Army ("Oglesby I"), 920 F.2d 57, 68 (D.C. Cir. 1990).

FOIA also contains a set of exceptions to an agency's general obligation to provide government records to the public.  See 5 U.S.C. § 552(b).  These "statutory exemptions, which are exclusive, are to be 'narrowly construed.'"  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of Air Force v. Rose, U.S. 352, 361 (1976)). The government therefore bears the burden of establishing that any claimed FOIA exemptions apply. ACLU v. Dep't of Defense, 628 F.3d 612, 619 (D.C. Cir. 2011).  And, "[i]f a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions."  Oglesby v. U.S. Dep't of Army ("Oglesby II"), 79 F.3d 1172, 1176 (D.C. Cir. 1996) (quoting 5 U.S.C. § 552(b)).

### III.  Analysis

Price challenges the agency's searches and its withholdings.  The Court will consider each challenge in turn.

### A.  Adequacy of the Agency's Searches

To establish the adequacy of its searches, an agency may rely upon declarations attesting with reasonable detail as to "what records were searched, by whom, and through what process." Steinberg v. DOJ, 23 F.3d 548, 552 (D.C. Cir. 1994).  Such declarations are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

    *1.   OJP's Searches*

The Government provides a single declaration from Monica Potter-Johnson, a Government Information Specialist who is responsible for processing FOIA requests for OJP, to describe OJP's searches and responses to Price's requests.  Potter-Johnson Decl. ¶ 1.  Price complains at the threshold that the Government cannot rely on a declaration from a supervisor or project coordinator that summarizes work performed by unidentified subordinates.  Pl. Cross-Mot. ¶¶ 18–20.  Not so.  Courts regularly rely on affidavits and declarations provided by those who coordinate the searches at issue in litigation.  See, e.g., SafeCard, 926 F.2d at 1201 (holding that the person "in charge of coordinating the [agency's] search . . . is the most appropriate person to provide a comprehensive affidavit"); Meeropol v. Meese, 790 F.2d 942, 951 (D.C. Cir. 1986) (permitting reliance on an affidavit of agency employee responsible for supervising the search at issue, although he necessarily relied upon information provided by staff members who actually performed search).  Reliance on such declarations is permissible where, as here, Potter-Johnson Decl. ¶ 3, the declarant "attests to h[er] personal knowledge of the procedures used in handling a FOIA request and h[er] familiarity with the documents in question."  Barnard v. DHS, 531 F. Supp. 2d 131, 138 (D.D.C. 2008) (internal quotation marks omitted).

    To warrant summary judgment, however, the agency official's declaration must be "reasonably detailed . . . , setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched."  DiBacco v. U.S. Army, 795 F.3d 178, 188 (D.C. Cir. 2015) (internal quotation marks omitted).  The Government has satisfied that burden with respect to OJP Request Nos. 17-00209, 18-00260, and 18-00294.  As to those requests, Ms. Potter-Johnson explains the search locations, methodology, and search terms used.  Potter-Johnson Decl. ¶¶ 24, 29–30, 32.  Given the discrete

nature of the requests (which each pertain to specific cases or individuals) and the search terms

provided, the Court is convinced that the agency's searches were reasonably calculated to

produce responsive documents.  See generally Judicial Watch, Inc. v. U.S. Dep't of Def., 857 F.

Supp. 2d 44, 54 (D.D.C. 2012), aff'd, 715 F.3d 937 (D.C. Cir. 2013) (finding it significant in

assessing the reasonableness of the agency's search that the request was not "for some broadly

defined class of documents the existence and whereabouts of which the agency was likely

unaware and that might be maintained in any number of records systems" but rather was "related

to a discrete set of extraordinarily high-profile records").

Price's main retorts amount to grievances that the agency failed to search the vast

expanse of all DOJ systems or use all possible search terms.  See, e.g., Pl. Cross-Mot. ¶¶ 29–32

(suggesting search locations that the agency could have tried); id. ¶ 24 (suggesting additional

search terms that the agency could have included).  But it is well established that an "agency

generally need not 'search every record system'" under the sun.  Campbell v. DOJ, 164 F.3d 20,

28 (D.C. Cir. 1998) (quoting Oglesby I, 920 F.2d at 68).  Here, the agency reasonably exercised

its "discretion to confine its inquiry to a central filing system if additional searches are unlikely

to produce any marginal return."  Id.  Nor is an agency obligated to "use the search terms

proposed" by a plaintiff.  Physicians for Hum. Rts. v. U.S. Dep't of Def., 675 F. Supp. 2d 149,

164 (D.D.C. 2009).  FOIA affords agencies substantial "'discretion in crafting a list of search

terms' as long as they are 'reasonably tailored to uncover documents responsive to the FOIA

request.'"  Tushnet v. ICE, 246 F. Supp. 3d 422, 434 (D.D.C. 2017) (Cooper, J.) (quoting

Bigwood v. U.S. Dep't of Def., 132 F. Supp. 3d 124, 140–41 (D.D.C. 2015)).  Here, the agency

chose search terms that closely paralleled the language of Price's own requests, and Price does

not offer any evidence that the agency's queries were not reasonably calculated to turn up

responsive documents.  See Cooper v. Stewart, 763 F. Supp. 2d 137, 143 (D.D.C. 2011), aff'd,

No. 11-5061, 2011 WL 6758484 (D.C. Cir. Dec. 15, 2011) ("Speculation as to the potential

results of a different search do not necessarily undermine the adequacy of the agency's actual

search.").  The Court will therefore grant summary judgment to the Government on its searches

in response to OJP Request Nos. 17-00209, 18-00260, and 18-00294.

       The Court cannot be as sure, however, that the agency's search was reasonably calculated

to recover all documents responsive to OJP Request No. 18-00157.  In that request, Price sought

all case tracking reports made by ICAC-TF for Case No. LC-10-12-141.  Potter-Johnson Decl.,

Attach. A at 12.  Ms. Potter-Johnson averred that the agency searched the ICAC-TF electronic

portal and OJJDP network drive using the search terms, "CaseTracker," "Case Tracker," and

"Case Tracking Report."  Id. ¶ 29.  As Price points out, the most specific search term—the case

number—is conspicuously missing.  Pl. Cross-Mot. ¶ 20; cf. Brennan Ctr. for Just. at N.Y. Univ.

Sch. of Law v. DOJ, No. 18-cv-1841 (ABJ), 2020 WL 1451503, at *7 (D.D.C. Mar. 25, 2020)

(holding that "DOJ's search was inadequate because it did not tailor the search terms to

plaintiff's specific request").  The omission appears even more conspicuous in light of the

agency's use of case numbers as search terms in handling other similar requests from Price.  See,

e.g., Potter-Johnson Decl. ¶ 32 (averring that case numbers were used as search terms for

Request No. 18-00294).  There may be a reasonable explanation for why the Potter-Johnson

Declaration does not mention the case number as a search term for Request No. 18-00157: for

example, the agency may have manually searched its systems for files associated with the case

number at issue.  See, e.g., Cooper, 763 F. Supp. 2d at 144 (holding that the agency's search was

reasonable where the agency's declarants explained how information could be retrieved from the

agency's electronic system using a case number).  However, the current record lacks sufficient

details concerning the agency's search methodology for the Court to discern whether the search was reasonably calculated to uncover all documents responsive to Request No. 18-00157.[2]

Nor has the agency established beyond material doubt that it conducted a reasonable search in response to Request No. 18-00136, which sought charts and reports concerning OJP's and other entities' expenditures, grants, reimbursements, and disbursements from 2008 to 2017. Potter-Johnson Decl., Attach. A at 5–8. Ms. Potter-Johnson explains that the agency forwarded the request to the Office of the Chief Financial Advisor, which searched OJP's financial system to download a general ledger chart of accounts and shared drive directories. Id. ¶ 26. But the declaration does not elaborate on what was done to search these materials for responsive documents, such as the search methodology or search terms (if any).

The record is also insufficient with respect to the agency's search in response to Request No. 18-00059—Price's request for the ICAC-TF Operational Manual. Id. ¶ 25, Attach. C at 2. That request was forwarded to OJJDP, which responded that it was not in possession of any document titled "ICAC Operational Manual." Id. ¶ 25. Although FOIA does not obligate an agency to create a document that it doesn't have in response to a party's request, see Espinoza v. DOJ, 20 F. Supp. 3d 232, 245 (D.D.C. 2014), the agency is required to at least explain why "there was no reasonable expectation of finding responsive documents," Thomas v. Comptroller of Currency, 684 F. Supp. 2d 29, 33 (D.D.C. 2010) (internal quotation marks omitted), or to explain how it conducted a reasonable search of its extant records for responsive documents.

---

[2] The fact that the agency was able to locate 100 pages of responsive documents suggests that the agency had a way to find documents related to the specific case at issue. The agency should better explain that methodology on remand.

Here, the record is devoid of details on what type of search, if any, OJJDP did in response to Request No. 18-00059.[3]

Finally, the record is even thinner with respect to Request Nos. 18-00150, 18-00156, and 18-00288.  The Potter-Johnson Declaration merely recites that "[a] reasonable search was conducted and completed of all locations likely to contain the requested records," without providing any additional detail on the search protocol, locations, methodology, or terms used. Potter-Johnson Decl. ¶¶ 27–28, 31.  These "merely conclusory statements" do not supply the requisite "reasonable specificity of detail" to warrant summary judgment.  Consumer Fed'n of Am. v. Dep't of Agric., 455 F.3d 283, 287 (D.C. Cir. 2006).[4]

Accordingly, the Court grants summary judgment to the agency only with respect to its searches in response to OJP Request Nos. 17-00209, 18-00260, and 18-00294.  The Court denies summary judgment with respect to the agency's searches in response to OJP Request Nos. 18-00059, 18-00156, 18-00157, 18-00136, 18-00150, 18-00156, and 18-00288 and remands to the

---

[3] Price points out that he was able to obtain a copy of the "ICAC Operations Manual" through a separate request submitted directly to the ICAC-TF.  Pl. Cross-Mot. ¶ 28.  If anything, the fact that Price was able to obtain the manual from a difference office suggests that OJP was not the right place to submit a request for the manual and supports OJP's representation that it did not possess the manual.  Still, OJP should explain its search efforts on remand.

[4] With respect to Request No. 18-00156, the parties dispute whether OJP was obligated to collect SHA-1 values.  See Pl. Reply ¶ 32; Gov. Sur-Reply 1–2.  FOIA does not obligate agencies to create records in response to a plaintiff's request.  See Espinoza, 20 F. Supp. 3d at 245.  Whether OJP was obligated to collect SHA-1 values—and its failure to do so—bear on Price's FRA/APA claims.  The agency may satisfy its obligations under FOIA by providing either a more detailed explanation as to why it did not conduct a search for portions of Request No. 18-00156 "because there was no reasonable expectation of finding responsive documents," Thomas, 684 F. Supp. 2d at 33, or, if a full search was conducted, providing more detail on what that search entailed.

agency for further explanation of search locations, search methodology, search terms (if any), and what responsive documents were located.

### 2. *Criminal Division's Searches*

By contrast, the record establishes that the Criminal Division conducted reasonable searches in response to CRM Request No. 300634425.  The Government provides declarations from Amanda Marchand Jones, the Chief of the Criminal Division's FOIA Unit, and Christina Butler, the Deputy Chief of that same unit.  Jones Decl. ¶ 1; Butler Decl. ¶ 1.  Together, the Jones and Butler Declarations identify the record systems and locations that were searched, explain why the relevant information could reasonably have been expected to be found in those those locations and systems, and describe the scope and methodology of the searches.  See Jones Decl. ¶¶ 16–27; Butler Decl. ¶¶ 10–14.  Although the declarations do not provide search terms, most of the Criminal Division's searches were done manually, Butler Decl. ¶ 10, so search terms were not used or needed, see Aguiar v. DEA, 865 F.3d 730, 739 (D.C. Cir. 2017) (noting that an explanation that documents were examined manually would suffice).  That the Criminal Division located all but one of the six requested documents further supports the inference that the searches were reasonable.  See Jones Decl. ¶¶ 28–33; Butler Decl. ¶ 6 n.2.[5]

_____

[5] The sixth record that Price requested was "[a] complete list of Equities requested for implementation from and Equities submitted to the Executive Secretariat (the National Security Agency, Information Assurance Directorate) pursuant to paragraph 49 of the Joint Plan for the Coordination and Application of Offensive Capabilities to Defend U.S. Information Systems of NSPD-54/HSPD-23," which "shall include every Equity identified, submitted, requested, or implemented by CEOS/HTIU pursuant to the Commercial and Government Information Technology and Industrial Control Product or System Vulnerabilities Equity Policy and Process ('VEP')."  Jones Decl. ¶ 7, Exh. A at 2.  A bit of background is in order.  Issued by the White House in November 2017, the VEP provides guidance to federal agencies and departments on how to deal with newly discovered and non-public vulnerabilities in the federal government's information systems and technologies.  White House, Vulnerabilities Equities Pol'y & Process

"Because the agency has demonstrated that the searches were reasonable, the burden shifts to the plaintiff to prove otherwise, either by providing evidence that undermines the search procedure or by demonstrating bad faith." Appleton v. FDA, 451 F. Supp. 2d 129, 140 (D.D.C. 2006). Price has not satisfied that burden here. Aside from his complaints about the extent of Ms. Jones's and Ms. Butler's personal knowledge as supervisors, which the Court has already rejected, he does not offer any reason to question the reasonableness of the Criminal Division's searches. The Court will therefore uphold the Criminal Division's searches in response to CRM Request No. 300634425.

---

for the U.S. Gov't 1 (Nov. 15, 2017),
https://www.whitehouse.gov/sites/whitehouse.gov/files/images/External%20-%20Unclassified%20VEP%20Charter%20FINAL.PDF. The process requires agencies to submit potential vulnerabilities to an Equities Review Board for review. Id. at 5–9. The Board is led by the National Security Agency and includes a representative from DOJ. Id. at 3–4.

Ms. Butler attested that the Child Exploitation and Obscenity Section "is not aware of any involvement in what the requester is referring to" in his sixth request. Butler Decl. ¶ 6 n.2. "CEOS's mission," she explained, "is to protect the welfare of America's children and communities by enforcing federal criminal statutes relating to the exploitation of children and obscenity." Id. (internal quotation marks omitted). The Court takes that attestation to mean that the CEOS did not have possession of the records sought, Gov. Sur-Reply 4–5, and Price points to nothing in the record beyond his own speculation that would establish that CEOS or HTIU, as subsections, were bound to maintain the information requested. See, e.g., Am.-Arab Anti-Discrimination Comm. v. DHS, 516 F. Supp. 2d 83, 87–88 (D.D.C. 2007) (finding declarant's attestation that the agency "does not maintain information relating to" the plaintiff's request, in conjunction with evidence of the declarant's familiarity with the information systems, to be sufficient "sufficient—if not exactly to show the adequacy of the search, then to explain why a search would be futile and is unnecessary"). The agency therefore was under no obligation to "search for records because it d[id] not maintain [the] records." Espino v. DOJ, 869 F. Supp. 2d 25, 28 (D.D.C. 2012); see also Kissinger v. Reps. Comm. for Freedom of the Press, 445 U.S. 136, 151–52 (1980) ("FOIA is only directed at requiring agencies to disclose those 'agency records' for which they have chosen to retain possession or control.").

### 3.  Section 552(c) Exclusions

Under Section 552(c) of FOIA, agencies are not obligated to search for—and may deny

the existence of—records that (1) implicate an ongoing criminal investigation; (2) concern an

undisclosed informant; or (3) pertain to foreign intelligence or counterintelligence, or

international terrorism.  5 U.S.C. § 552(c).  Each of the agency's response letters to Price

included the following disclaimer:

> For your information, Congress excluded three discrete categories of law
> enforcement and national security records from the requirements of the FOIA, See
> 5 U.S.C. 552(c).  This response is limited to those records that are subject to the
> requirements of the FOIA.  This is a standard notification that is given to all our
> requesters and should not be taken as an indication that excluded records do, or do
> not, exist.

Potter-Johnson Decl., Attach. D at 1, 3, 5, 7, 10, 11, 13, 15–16, 18; Jones Decl., Exh. F at 2.

Other than these boilerplate disclaimers, there is no indication in the record that the agency relied

on Section 552(c) to exclude any of Price's requests from its FOIA processing.  To the extent

that the agency did apply Section 552(c) exclusion(s), the appropriate procedure is for the agency

to submit an *ex parte* declaration explaining its reliance, if any, on the exclusion(s).  See, e.g.,

Light v. DOJ, 968 F. Supp. 2d 11, 30 (D.D.C. 2013).  Out of an abundance of caution, the

agency is directed on remand to submit an *ex parte* declaration either confirming that it did not

rely on § 552(c) exclusions or justifying their use.  Id.

### B.  Adequacy of the Agency's Disclosures

In order to prevail on withholdings under FOIA, an agency must provide the Court with

"sufficient information to determine, without the disclosure of actual documents, whether

information withheld by an agency falls within [a] claimed FOIA exemption."  Voinche v. FBI,

412 F. Supp. 2d 60, 65 (D.D.C. 2006).  An agency may satisfy that burden by submitting a

Vaughn index, providing the documents in question to the Court for *in camera* review, or

16

offering detailed affidavits or declarations.  Id. at 64–65.  Whatever form the agency chooses to employ, its submissions must "adequately describe each withheld document or deletion," id. at 65, and "show, with reasonable specificity, why the documents fall within the exemption," Evans v. Fed. Bureau of Prisons, 951 F.3d 578, 583 (D.C. Cir. 2020) (quoting Hayden v. NSA, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).

### 1.  OJP's Withholdings

In its release letters to Price, OJP stated that it made redactions or withholdings under Exemption 6, which shields personnel files, see Potter-Johnson Decl., Attach. D at 1–2 (Request No. 17-00209); id. at 9–12 (Request Nos. 18-00156 & 18-00157), Exemption 7(E), which protects records that reflect law enforcement techniques and procedures, see id. at 13–14 (Request No. 18-00260); id. at 15–16 (Request No. 18-00288), and Exemption 7(F), which covers law enforcement records that reasonably might endanger someone's physical safety, see id. at 13–14 (Request No. 18-00260).  One can easily surmise that many of Price's requests would implicate these exemptions.  However, nothing in the record explains what deletions the agency made or its rationale for applying these exemptions to particular records.  See Voinche, 412 F. Supp. 2d at 65; Evans, 951 F.3d at 583.  Nor is there sufficient information in the record to enable to the Court to determine if any non-exempt information was reasonably segregable. See Oglesby II, 79 F.3d at 1176.  The Court will therefore deny the Government's motion for summary judgment with respect to OJP's withholdings and remand for further explanation of the agency's application of Exemptions 6, 7(E), and 7(F).

### 2.  Criminal Division's Withholdings

As explained, the Criminal Division unearthed five documents responsive to CRM Request No. 300634425.  The Criminal Division made redactions to these documents under

Exemptions 2, 6, 7(C), 7(E), and 7(F).  Jones Decl. ¶ 28, Exh. F.  It also withheld 147 pages in

full under Exemptions 2, 6, 7(C), 7(E), and 7(F).  Id. ¶ 28, Exh. F.  Price does not challenge the

Criminal Division's withholdings under Exemption 7(F), so the Court will only analyze the

agency's justifications for applying the remaining exemptions.  Pl. Cross-Mot. ¶¶ 16, 44 & n.2.[6]

### a.   Exemption 2 Withholdings

Exemption 2 applies to materials that are "related solely to the internal personnel rules

and practices of an agency."  5 U.S.C. § 552(b)(2).  The Supreme Court has held that the

statutory phrase "personnel rules and practices" refers to an agency's "rules and practices dealing

with employee relations or human resources."  Milner v. Dep't of Navy, 562 U.S. 562, 570

(2011).  Therefore, Exemption 2 only encompasses information that pertains solely to "the

conditions of employment in federal agencies—such matters as hiring and firing, work rules and

discipline, compensation and benefits."  Id.[7]  However, "it does not exempt 'matters [that are]

subject to . . . a genuine and significant public interest[.]"  Sheridan v. OPM, 278 F. Supp. 3d 11,

19 (D.D.C. 2017) (quoting Rose, 425 U.S. at 369) (alterations in original); see also Shapiro v.

---

[6] The Criminal Division asserted Exemption 7(F) over the CEOS's floor plan and
information in the HTIU Manual "pertaining to the HTIU location and a description of the
workplace."  Jones Decl. ¶¶ 32, 33(f).

[7] Prior to Milner, the D.C. Circuit had drawn a distinction between "High 2" exemptions
(which protected against the disclosure of information that would risk circumvention of the law)
and "Low 2" exemptions (which protected materials concerning human resources and employee
relations).  See, e.g., Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992), abrogated by
Milner, 562 U.S. at 571.  The Milner Court erased that distinction, ruling that "Low 2 is all of 2
(and that High 2 is not 2 at all)."  Milner, 562 U.S. at 571 (internal citation omitted).

DOJ, 153 F. Supp. 3d 253, 278–80 (D.D.C. 2016) (explaining that the "public interest" limitation from Rose survives Milner).

The Criminal Division asserted Exemption 2 over certain portions of Document No. 5, the HTIU Manual. The information redacted included the names of CEOS personnel and the identification of their supervisor for performance review purposes, personnel management information, the section's recruiting plan for computer forensic scientists and interns, orientation and training programs, email lists, and continuing education practices. Jones Decl. ¶¶ 33, 35. Ms. Jones attests that "[t]his information was created exclusively *for* the internal use of HTIU to assist computer forensic specialists with the implementation of their roles and responsibilities related to evidence control and security." Id. ¶ 36 (emphasis added).

But, the Milner Court expressly rejected an interpretation of Exemption 2 that would "encompass[] records concerning an agency's internal rules and practices *for* its personnel to follow in the discharge of their governmental functions." Milner, 562 U.S. at 577 (emphasis added) (internal quotation marks omitted). Exemption 2 does not reach a "practice/rule [that] is *for* personnel," the Court explained, but rather only encompasses a "practice/rule [that] is *about* personnel—*i.e.*, that . . . relates to employee relations or human resources." Id. at 578; Pl. Cross-Mot. ¶ 43. The agency's withholding of "personnel management information" and its "recruiting plan" might qualify under this narrower standard, but the Court cannot be sure without further description of the information. Jones Decl. ¶ 33. The remaining information withheld by the agency appears to relate to "a broader set of agency rules and practices" to which Exemption 2 does not extend, Sack v. CIA, 53 F. Supp. 3d 154, 170 n.12 (D.D.C. 2014), such as internal training documents, see Nat'l Sec. Couns. v. CIA, 960 F. Supp. 2d 101, 173 (D.D.C. 2013), and internal phone numbers, see Brown v. FBI, 873 F. Supp. 2d 388, 400 (D.D.C. 2012).

The Criminal Division seems to have asserted other exemptions over at least some of this information.  See, e.g., Jones Decl. ¶¶ 33(a), (c), (e), (f).  But it is unclear from the record whether these other exemptions are meant to apply to different portions of withheld information or apply with equal force to the same information.  The Court will therefore deny summary judgment on the Criminal Division's Exemption 2 withholdings and remand to the agency to clarify which segments of information also fall under other exemptions.  In doing so, the agency may find it helpful to provide that clarification in the form of a Vaughn index rather than the sprawling paragraph descriptions that the Jones Declaration currently employs.  See Vaughn v. Rosen, 484 F.2d 820, 828 (D.C. Cir. 1973) ("It seems probable that some portions may fit under one exemption, while other segments fall under another, while still other segments are not exempt at all and should be disclosed.  The itemization and indexing that we herein require should reflect this.").  To the extent that the agency intends to continue to rely on Exemption 2 over any of the withholdings, the agency should provide a more detailed description of what information was excluded from release (e.g., more detailed than "personnel management information") and why.  See Hall v. DOJ, 552 F. Supp. 2d 23, 27 (D.D.C. 2008) (holding that "broad categorical descriptions" of the contents of emails withheld such as "internal information related to infrastructure" were "not sufficiently detailed" for the court in engage in meaningful review of the agency's withholdings).

  b.  Exemption 6 Withholdings

The Criminal Division asserted Exemption 6 in conjunction with Exemption 7(C) over all of Document No. 4 and portions of Document Nos. 2, 3, and 5.  Apparently, it is the agency's usual "practice" to assert Exemption 6 in conjunction with Exemption 7(C).  Jones Decl. 13 n.4.  Although both exemptions are intended to protect against "unwarranted invasion[s] of personal

privacy," 5 U.S.C. § 552(b)(6), (7)(C), they have different threshold requirements.  The Court will therefore analyze the Criminal Division's withholdings of portions of Document Nos. 2, 3, and 5 under Exemption 6 and its withholding of Document No. 4 under Exemption 7(C).

Exemption 6 permits the withholding of "personnel and medical files and similar files" where their disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  "[T]he threshold question is whether the requested information is contained in a personnel, medical, or similar file."  Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002).  If it is, courts must then weigh any "substantial" privacy interest implicated by disclosure of the information against any public interest in disclosure.  Multi Ag Media LLC v. USDA, 515 F.3d 1224, 1229–30 (D.C. Cir. 2008).  A privacy interest is "substantial" if it is "greater than . . . *de minimis*[.]"  Id.  "The only relevant public interest in disclosure to be weighed in this balance is the extent to which disclosure would . . . contribut[e] significantly to public understanding of the operations or activities of the government."  Bartholdi Cable Co. v. FCC, 114 F.3d 274, 282 (D.C. Cir. 1997) (internal quotation marks and emphasis omitted).

CRM Document Nos. 2, 3 and 5—the CEOS's phone list, organizational chart, and portions of the HTIU Manual pertaining to management and organization—meet Exemption 6's threshold requirement of qualifying as "personnel" or "similar files."  As the agency attests, they contain information that applies to particular individuals.  Jones Decl. ¶ 42; Judicial Watch, Inc. v. DOJ, 365 F.3d 1108, 1124 (D.C. Cir. 2004) ("The [statute's] reference to 'similar files' has been interpreted broadly to include those 'detailed Government records on an individual which can be identified as applying to that individual.'" (quoting U.S. Dep't of State v. Wash. Post Co., 456 U.S. 595, 602 (1982)); Prison Legal News v. Samuels, 787 F.3d 1142, 1147 (D.C. Cir. 2015)

(noting that Exemption 6 "covers not just files, but also bits of personal information, such as names and addresses").

The Criminal Division withheld the following information from Document Nos. 2, 3, and 5: the names of employees and their supervisors who do not interface with the public;[8] all employees' personal, government-issued cell, and direct office phone numbers; conference room phone numbers; guard and security phone numbers; information technology phone numbers; certain administrative services phone numbers; and office locations.  Jones Decl. ¶¶ 33(a), 46–47.  The Government has established that substantial privacy interests would be implicated by disclosure of the information withheld.  "Generally, government employees and officials, especially law enforcement personnel, have a privacy interest in protecting their identities because disclosure 'could subject them to embarrassment and harassment in the conduct of their official duties and personal affairs.'"  Moore v. Bush, 601 F. Supp. 2d 6, 14 (D.D.C. 2009) (quoting Halpern v. FBI, 181 F.3d 279, 296–97 (2d Cir. 1999)).  Here, Ms. Jones attests that withholding of the information at issue was necessary to protect the Section's employees from "harassment and unwanted publicity," especially "[c]onsidering the sensitive law enforcement work that [the] personnel conduct related to child exploitation and obscenity matters."  Jones Decl. ¶ 48.  Moreover, she attests, "disclosure would reveal job sensitive performance appraisal-related information that is usually maintained in an employee's personnel-related file."  Id. Withholding of the requested information is therefore necessary to preserve the employees'

---

[8] The agency released the names of CEOS employees serving in public-facing, supervisory, or leadership positions, except for those in the HTIU, "given the sensitive law enforcement function" (forensic analysis) of that unit.  Jones Decl. ¶¶ 45–46, 48.  The agency also withheld the names of all interns, paralegals, analysts, administrative staff, security, and technology personnel, whom, Ms. Jones attested, "have a heightened privacy interest in the release of their names given the nature and responsibilities of [the Section]."  Id. ¶ 46.

"effectiveness in handling their respective prosecution or investigation functions and duties." Id.
The Court finds these predictions of harm highly credible.

Compared to these substantial privacy interests, Price identifies little public benefit to be
derived from disclosure. Revealing the names and contact information of sensitive law
enforcement personnel sheds little light on how the CEOS works or how well it performs its
duties. Id. ¶ 49; see generally Judicial Watch, 365 F.3d at 1126 (noting that "these types of
personal records are unlikely to shed light on the Department's conduct in the pardoning
process").[9] And, the public interest "does not include helping an individual obtain information
for his personal use." Oguaju v. United States, 288 F.3d 448, 450 (D.C. Cir. 2002), vacated and
remanded on other grounds, 541 U.S. 970, 124 (2004), reinstated, 378 F. 3d 1115 (D.C. Cir.
2004). The Court therefore grants summary judgment to the agency on the Criminal Division's
Exemption 6 withholdings of portions of CRM Document Nos. 2, 3, and 5.[10]

c. Exemption 7 Withholdings

Exemption 7 exempts protects "records or information compiled for law enforcement
purposes" where their disclosure could "reasonably be expected" to cause one of the harms

---

[9] Price separately contends that the redacted information constitutes "scientific records"
and therefore must be released under internal agency guidance, including the DOJ's "Scientific
and Research Integrity Policy," Pl. Cross-Mot., Exh. D, and the Office of Management and
Budget's "Information Quality Bulletin for Peer Review," 70 Fed. Reg. 2664 (Jan. 14, 2005).
The fact that the personnel whose names and contact information were withheld engage in
forensic science processes does not make their names and contact information "scientific
records" under the relevant guidance. Nor does Price explain how the guidance overrides the
agency's protections under FOIA.

[10] The Court is satisfied that the agency reasonably segregated non-exempt information.
See Jones Decl. ¶ 52 ("Every effort has been made to release all segregable information to
plaintiff without invading the privacy interests of individuals who were mentioned in the records.
Where possible, only the signatures, usernames, names, and contact information were
protected.").

enumerated in the subparts of the exemption.  5 U.S.C. § 552(b)(7).  The provision's threshold requirement—that the information was "compiled for law enforcement purposes"—is to be construed broadly.  "[I]nformation need not have been originally 'compiled for law enforcement purposes' to satisfy Exemption 7's threshold requirement," Milner, 562 U.S. at 584 (Alito, J., concurring) (quoting 5 U.S.C. § 552(b)(7)), so long as it was "created, gathered, or used by an agency for law enforcement purposes at some time before the agency invoke[d] the exemption," Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico, 740 F.3d 195, 203 (D.C. Cir. 2014).  And, as the D.C. Circuit has recognized, "[l]aw enforcement entails more than just investigating and prosecuting individuals *after* a violation of the law"; it also includes "proactive steps designed to prevent criminal activity and to maintain security."  Id. (quoting Milner, 562 U.S. at 582 (Alito, J., concurring)) (emphasis in original).  To meet Exemption 7's threshold requirement, the agency need only show "a rational nexus between the investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law."  Campbell, 164 F.3d at 32 (internal quotation marks and citations omitted).

The Criminal Division asserted Exemption 7 over Document No. 4 (an index of HTIU cases) and portions of Document No. 5 (the HTIU Manual).  These documents easily clear the threshold hurdle of "being compiled for law enforcement purposes," and Price does not contend otherwise.  Pl. Cross-Mot. ¶ 63.  They were created by law enforcement agencies, which "receive a special deference in their claims of law enforcement purpose," Gellman v. DHS, No. 16-CV-635 (CRC), 2020 WL 1323896, at *14 (D.D.C. Mar. 20, 2020) (Cooper, J.) (quoting Pinson v. DOJ, 313 F. Supp. 3d 88, 113 (D.D.C. 2018)), and include information on specific criminal case files as well as operational techniques and methods used to facilitate the investigation of

computer-related child exploitation offenses, see, e.g., Blackwell v. FBI, 646 F.3d 37, 40 (D.C. Cir. 2011) ("The documents generated in the course of investigating and prosecuting [Plaintiff] . . . were quite obviously related to the FBI's law enforcement duties.").  The Court will therefore proceed to determining whether the disclosure of the information withheld from these documents could reasonably result in any of the consequences listed in Exemption 7.

<em>i.     Exemption 7(C)</em>

Exemption 7(C) protects information the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C). The balancing tests for Exemption 6 and 7(C) are similar, see Schrecker v. DOJ, 349 F.3d 657, 661 (D.C. Cir. 2003) ("Exemption 7(C) requires the agency and the reviewing court to weigh the public interest in the release of information against the privacy interest in nondisclosure."), although Exemption 7(C) is even broader, Roth v. DOJ, 642 F.3d 1161, 1173 (D.C. Cir. 2011). Because the Court upheld the Criminal Division's partial withholdings of Documents No. 2, 3, and 5 under Exemption 6, it will only address the withholding of Document No. 4 under Exemption 7(C).[11]

Document No. 4, an index of HTIU cases from 2011 to 2012, contains internal case identifiers, names of third parties against whom charges were filed, and source agency information related to the investigations and prosecutions.  Jones Decl. ¶ 32.  The D.C. Circuit has "consistently" applied Exemption 7(C) to protect "names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses,

---

[11] To the extent that Documents No. 2, 3, and 5 meet Exemption 7's threshold requirement, the agency has established that the information withheld from those documents "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

and informants."  <u>Schrecker</u>, 349 F.3d at 661 (citing cases).  Price does not dispute that the agency was not required to reveal its sources; he contends only that the Department's public filing of charges against the third parties eliminated any privacy interest they had in protecting their identities.  Pl. Cross Mot. ¶¶ 58–62.  But, Ms. Jones attests that "[r]elease of this information would not only reveal the[] [third-parties'] names, but also details regarding their criminal history that is not freely available to the public."  Jones Decl. ¶ 51.  Withholding of Document No. 4 was therefore justified to shield these individuals from "harassment, embarrassment, or undue public attention."  <u>Id.</u>; <u>see also</u> <u>SafeCard</u>, 926 F.2d at 1205 ("There is little question that disclosing the identity of targets of law-enforcement investigations can subject those identified to embarrassment and potentially more serious reputational harm." (internal quotation marks omitted)).

 Nor has Price shown that Document No. 4 was reasonably segregable.  Pl. Cross Mot. ¶ 38(iii)(a).  Ms. Jones attested that "all pages of records were reviewed line-by-line," that "every effort has been made to release all segregable information to plaintiff," and that the document was withheld in full because "either there was no reasonably segregable material or any non-exempt information amounted to essentially meaningless words or phrases."  Jones Decl. ¶¶ 52, 64.  These attestations suffice to establish that Document No. 4 was not reasonably segregable, <u>see, e.g.</u>, <u>Abuhouran v. U.S. State Dep't</u>, 843 F. Supp. 2d 73, 82 (D.D.C. 2012) (accepting similar attestations as to segregability), and Price points to nothing in the record that would suggest otherwise, <u>see</u> <u>Scudder v. CIA</u>, 254 F. Supp. 3d 135, 145 (D.D.C. 2017) ("The plaintiff's speculation that the documents contain segregable information is plainly insufficient to rebut the presumption that the [Government's] declaration . . . w[as] prepared and submitted in good

faith.").  Therefore, the Court will grant summary judgment to the agency on its withholding of Document No. 4 under Exemption 7(C).

ii.    *Exemption 7(E)*

Exemption 7(E) allows law enforcement agencies to withhold documents that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The bar for justifying withholding under Exemption 7(E) is "relatively low"—the Government need only "demonstrate logically how the release of the requested information [may] create" a risk of circumvention.  Blackwell, 646 F.3d at 42 (quoting Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009)).  Exemption 7(E) encompasses case-specific materials as well as "materials [that] have not been compiled in the course of a specific investigation."  Tax Analysts v. IRS, 294 F.3d 71, 79 (D.C. Cir. 2002).

The Criminal Division withheld portions of Document No. 5, the HTIU Operations Manual, under Exemption 7(E).  The withholdings included information on evidence control and security, including evidence submission, storage, check-in and check-out (including tracking and acquisition documentation); evidence quality assurance procedures; software information; evidence systems information, including security procedures; hardware and software information and configurations; database and application maintenance; and the control requirements and operating procedures necessary to handle evidence.  Jones Decl. ¶¶ 33(d), 54.

Price contends that these evidentiary procedures do not qualify as "investigative techniques" within the meaning of Exemption 7(E).  Pl. Cross-Mot. 22–23.  But that contention rests on an overly cramped interpretation of Exemption 7(E).  Disclosure of the Unit's evidence

control and security procedures, Ms. Jones explained, "could enable . . . targets to take

countermeasures to circumvent the effectiveness and integrity of the process," "reveal where

investigatory information is maintained on the Criminal Division network system because

network file path information is contained in the operations manual," and enable targets "to

discover and target vulnerabilities in the evidence control system or security plan."  Jones Decl.

¶¶ 55–56.  The Court is satisfied that "[t]hese statements logically explain how the data could

help criminals circumvent the law, and that suffices here to justify invocation of Exemption

7(E)."  Blackwell, 646 F.3d at 42 (holding that Exemption 7(E) protects "methods of data

collection, organization and presentation" contained in agency reports); see also Reps. Comm.

for Freedom of the Press v. FBI, No. 15-CV-1392 (RJL), 2020 WL 1324397, at *10 (D.D.C.

Mar. 20, 2020) (upholding the application of Exemption 7(E) to non-public FBI procedures,

techniques, and guidance for conducting investigations); Sheridan v. OPM, 278 F. Supp. 3d 11,

23 (D.D.C. 2017) (upholding Government's application of Exemption 7(E) to e–QIP source code

and related manuals based in part on fear of cyber-intrusion).

The Criminal Division also withheld information in the HTIU Manual that pertains to

training and compliance requirements for CEOS personnel, including forensic specialists

regarding evidence control.  Jones Decl. ¶¶ 33(c), 33(e), 54.  Although Ms. Jones's description of

the training and quality assurance materials withheld is somewhat generalized, id., she attested

that "only that information which would reveal the techniques and procedures related to evidence

control, analysis, and security w[as] withheld," id. ¶ 57.  And Price points to nothing in the

record that would indicate that non-evidence related training or quality assurance materials were

withheld.  It therefore can be said that "releasing information about training and the

associated . . . procedures is tantamount to releasing information about the actual employment of

the procedures and techniques themselves."  Citizens for Resp. & Ethics in Wash. v. DOJ, 160 F.

Supp. 3d 226, 243 (D.D.C. 2016) (internal quotation marks omitted); see also Elec. Privacy Info.

Ctr. v. Customs & Border Prot., 248 F. Supp. 3d 12, 18–19 (D.D.C. 2017), aff'd, No. 17-5078,

2017 WL 4220339 (D.C. Cir. Aug. 1, 2017) (holding that training materials were protected under

Exemption 7(E)).  Accordingly, summary judgment is granted as to the entirety of the Criminal

Division's Exemption 7(E) withholdings.[12]

## IV.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part the Government's

motion for summary judgment and deny Price's motion for summary judgment.  To reiterate,

summary judgment is granted to the Government as to OJP's searches in response to Request

Nos. 17-00209, 18-00260, and 18-00294, the Criminal Division's searches in response to CRM

Request No. 300634425, and the Criminal Division's withholdings under Exemptions 6, 7(C),

7(E), and 7(F).  Summary judgment is denied as to OJP's searches in response to Request Nos.

18-00059, 18-00156, 18-00157, 18-00136, 18-00150, 18-00156, and 18-00288, all of OJP's

withholdings, and the Criminal Division's withholdings under Exemption 2.  On remand, OJP is

directed to provide a fuller explanation of search locations, search methodology, search terms (if

any), and what responsive documents were located for the remaining requests and a fuller

explanation of what was withheld under Exemptions 6, 7(E), and 7(F) from all responsive

---

[12] The Court accepts the Government's representation that further segregation was not
reasonably possible.  Jones Decl. ¶ 57 ("In each instance where information was withheld from
plaintiff pursuant to Exemption 7(E), only that information which would reveal the techniques
and procedures related to evidence control, analysis, and security were withheld, and it is
reasonably foreseeable that disclosure of this information would harm the interests protected by
this provision.  No nonexempt information was withheld pursuant to this exemption and thus
further segregation was not possible.").

documents and its justification for the withholdings.  The Criminal Division is directed to explain in further detail what information was withheld under Exemption 2 and why, and to clarify which segments of information were also subject to other exemptions.  Both OJP and the Criminal Division are directed to submit an *in camera* declaration confirming that no Section 552(c) exclusions were applied or justifying the application of any exclusions.  A separate order follows.

_____
CHRISTOPHER R. COOPER
Date: July 14, 2020                                   United States District Judge